## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| UNITED TAX GROUP, LLC, | ) | Case No. 14-10486 (LSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| George L. Miller, Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 15-50880 (LSS) |
| | ) | |
| v. | ) | |
| | ) | Re: Docket. Nos. 76, 79 |
| SWZ Financial, II LLC | ) | |
| TAX HELP MD, INC., | ) | |
| ALLERAND, LLC, and | ) | |
| RICHARD J. SABELLA, | ) | |
| | ) | |
| Defendants. | ) | |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Introduction

Before me are Defendants' motions for summary judgment seeking a favorable ruling on each count of a twelve-count complaint brought by George L. Miller, the chapter 7 trustee. The entire bankruptcy case has been contentious since day one, but I recommend to the district court that this adversary proceeding end without a trial. While many of Defendants' arguments could serve as the basis for granting summary judgment, ultimately, Trustee must lose because he failed to submit valuation testimony as of the salient dates. We are past time for plaintiff allegations and theories; evidence must be submitted. As set forth below, I find Trustee's evidence wholly lacking. A "mere scintilla" of evidence or

reliance on inferences untethered to facts is not enough to prevent summary judgment once

Defendants have provided a detailed evidentiary record and challenged elements of a cause

of action on which Trustee has the burden of proof.  I recommend that summary judgment

be granted in favor of all Defendants.

**Procedural Posture**

On March 5, 2014 ("Petition Date"), United Tax Group, LLC ("United Tax" or

"Debtor") filed a voluntary petition for relief under chapter 7 of the United States

Bankruptcy Code.  George L. Miller ("Plaintiff" or "Trustee") was subsequently appointed

as trustee to administer the assets of Debtor's bankruptcy estate.

On June 25, 2015, Trustee filed a complaint ("Complaint")[1] against Defendants

SWZ Financial II, LLC ("SWZ"), Tax Help, MD, Inc. ("Tax Help"), Allerand, LLC and

Richard Sabella seeking $3 million in damages and alleging causes of action sounding in

preference, constructive fraudulent conveyance, breach of fiduciary duty and aiding and

abetting breach of fiduciary duty.  The Counts in the Complaint are:

| Count | Causes of Action[2] | Defendant(s) |
|---|---|---|
| Count I | § 547 preference claim:  One Year Transfers | SWZ |
| Count II | § 547 preference claim:  Security Interest | SWZ |
| Count III | § 547 preference claim:  Foreclosed/Transferred Assets | SWZ |
| Count IV | § 548(a)(1)(B) constructive fraudulent conveyance claim:  Foreclosed/Transferred Assets; Two Year Transfers | SWZ |
| Count V | § 544 Florida Statutes Title XLI, § 726.105(1)(b): constructive fraudulent conveyance claim as to present and future creditors: Foreclosed/Transferred Assets; Two Year Transfers | SWZ |

---

[1] D.I. 1 (Compl. of George Miller, Chapter 7 Trustee, Against SWZ Financial II, LLC, Tax Help MD Inc., Allerand, LLC, and Richard J. Sabella Pursuant to 11 U.S.C. §§ 544 and 548, Florida Statutes Title XLI § 726.105 *et. seq.*, Federal Rule of Bankruptcy Procedure 7001, and Applicable Law).

[2] Capitalized terms in this table are defined below.

2

| Count VI | § 544 Florida Statutes Title XLI, § 726.106(1): constructive fraudulent conveyance claim as to present creditors: Foreclosed/Transferred Assets; Two Year Transfers | SWZ |
|---|---|---|
| Count VII | § 544 Florida Statutes Title XLI, § 726.106(2): constructive fraudulent conveyance claim/insider as to present creditors: Foreclosed/Transferred Assets; Two Year Transfers | SWZ |
| Count VIII | § 550 recovery of avoided transfers against initial/immediate or mediate transferee: Foreclosed/Transferred Assets | SWZ Tax Help |
| Count IX | § 550 recovery of avoided transfers against initial/immediate or mediate transferee: Two Year Transfers | SWZ |
| Count X | Florida Statutes Title XLI, § 726.108: recovery of avoided transfers: Foreclosed/Transferred Assets; Two Year Transfers | SWZ Tax Help |
| Count XI | Breach of fiduciary duty | Allerand, LLC |
| Count XII | Aiding and abetting breach of fiduciary duty | Sabella |

On October 31, 2016, Trustee filed a motion to amend his Complaint ("Motion to Amend")[3] accompanied by a supporting brief.[4] Attached as an exhibit to the brief was a redlined version of a proposed amended complaint adding new causes of action sounding in actual fraud under the Bankruptcy Code and Florida law.[5] I denied the Motion to Amend.[6]

In the meantime, SWZ filed a motion for summary judgment[7] as did Tax Help, Allerand, LLC, and Sabella[8] (collectively "Motions") together with opening briefs[9] and

---

[3] D.I. 94.

[4] D.I. 95.

[5] D.I. 95-1.

[6] *Miller v. SWZ Financial II, LLC*, Adv. Pro. No. 15-50880 (LSS), 2018 WL 1135496 (Bankr. D. Del. Feb. 28, 2018).

[7] D.I. 76.

[8] D.I. 79.

[9] Opening Br. in Supp. of Def. SWZ Financial II, LLC's Mot. for Summ. J. ("SWZ Opening Brief"), D.I. 77, Opening Br. in Support of Defs. Tax Help MD, Inc., Allerand, LLC and Richard Sabella's Joint Mot. for Summ. J. ("Tax Help Opening Brief"), D.I. 80.

voluminous exhibits.[10] Trustee filed a joint answering brief to both Motions and Defendants filed a joint reply brief.[11]

After reviewing the initial briefing and exhibits, it was apparent that Trustee had not submitted any valuation evidence to support his $3 million demand or to rebut the valuation testimony Defendants submitted in support of the Motions. At a hearing on one of the many other contested matters in this case, I raised this issue and gave Trustee an opportunity to supplement the record.[12] In response, Trustee filed the Brownstein Report and Defendants filed the Expert Report of Brett A. Margolin, Ph.D[13] together with further briefing.[14] Separately, I denied Trustee's motion *in limine* and granted in part, Trustee's motion to strike certain evidence submitted by SWZ in support of the Motions.[15]

In February 2021, I heard oral argument on the Motions. At oral argument, Plaintiff's counsel requested the opportunity to submit additional evidence in support of his position. Plaintiff contended that certain testimony previously adduced in contested matters

---

[10] Defendants' Exhibits across their multiple briefs are labeled, consecutively, Exhibit A to Exhibit ZZ ("SWZ Ex. ___"), D.I.s 85, 86, 87, 102, 152. Trustee's exhibits across his multiple briefs are labeled Exhibit A to Exhibit R (D.I. 92) and Exhibit A to Exhibit D (D.I. 151). The first set of exhibits will be referred to as "Trustee Ex. ___." As for the second set of exhibits, the only one I will refer to is Exhibit A, the expert report of The Brownstein Corporation which will be referred to as the "Brownstein Report."

[11] Trustee's Br. in Opp'n to Defs.' Mot. For Summ. J. ("Answering Brief"), D.I. 92; Joint Reply Br. in Supp. Of Defs.' Mot. for Summ. J., D.I. 100.

[12] 2/20/17 Hr'g Tr. 118:9-122:19, (Case No. 14-10486, D.I. 163).

[13] SWZ Ex. WW (Expert Report of Brett A. Margolin, Ph.D).

[14] Trustee's Suppl. Br. in Opp'n to Defs' Mot. for Summ. J., D.I. 151; Joint Suppl. Br. in Supp. of Defs.' Mot. for Summ. J., D.I. 152.

[15] *Memorandum and Order Regarding Trustee's Motion in Limine and Motion to Strike*, D.I. 159. Consistent with this Order, I will not consider paragraphs 9 and 12 of the Affidavit of Dean Drouin in Support of Defendants' Motions for Summary Judgment ("Drouin Aff."), SWZ Ex. U.

4

in the main bankruptcy case supported Plaintiff's position here. I granted that request and on March 19, 2021, Plaintiff filed a letter submission identifying transcript excerpts.[16]

The record is now closed and this matter is ripe for decision.[17]

**Jurisdiction**

Jurisdiction exists over each of the Counts in the Complaint pursuant to 28 U.S.C. § 1334 because each is at least related to the bankruptcy case. Counts I through IV, VIII and IX assert causes of action under §§ 547, 548 and 550 of the Bankruptcy Code and thus are enumerated core proceedings under 28 U.S.C. § 157(b)(2)(F) or (H). Counts V through VII and X assert fraudulent conveyance claims under Florida state law, which the Trustee is permitted to pursue under § 544 of the Bankruptcy Code. These are also enumerated core proceedings under § 157(b)(2)(H).[18] Counts XI and XII assert purely state law claims and are thus non-core proceedings.

Defendants have not consented to entry of a final judgment in the event I cannot enter one consistent with Article III of the Constitution[19] nor have they filed proofs of claim. Plaintiff demanded a jury trial on "all issues triable of right by a jury."[20] Under these circumstances and because Trustee is demanding money damages, which are the same

---

[16] Trustee's Letter to Hon. Laurie Selber Silverstein ("Trustee's Letter"), D.I. 171. Defendants had nothing further to add in response to Trustee's submission, *see* Defs.' Letter to Court in Resp. to Trustee's Letter, D.I. 172.

[17] Trial was originally scheduled for October 26, 2020, and subsequently re-scheduled multiple times due to the pandemic. There is no currently scheduled trial date.

[18] *In re Maxus Energy Corp.*, 597 B.R. 235 (Bankr. D. Del. 2019).

[19] D.I. 4.

[20] D.I. 5. Arguably, this request is waived as Plaintiff did not file a motion to withdraw the reference even in the face of multiple agreed-to trial dates.

across both the enumerated core proceedings and a clearly non-core proceeding, I will issue

proposed Findings of Fact and Conclusions of Law for consideration by the District Court.[21]

**Proposed Findings of Fact**

### A. The Loan from SWZ

United Tax was formed as a Delaware limited liability company by Allerand, LLC,

ECW Investco, LLC ("ECW") and Dean Drouin on August 28, 2009.[22] Allerand, LLC is

owned and controlled by Defendant Sabella[23] and was the managing member of United

Tax.[24] ECW is 100% owned by Ward Welke.[25]

On December 8, 2010, United Tax acquired all the assets and limited liability

company interests of FR Tax Group, LLC ("FR Tax").[26] Michael Mourgides and Adam

Bulyar, who were previously affiliated with FR Tax, were admitted as members of United

Tax on May 16, 2011 and January 1, 2012, respectively.[27] After the admission of Bulyar,

the profit interests were divided 58.000% to Allerand, LLC, 9.999% to ECW, 12.003% to

Drouin, 9.999% to Mourgides, and 9.999% to Bulyar.[28] The only capital contribution

reflected in the Debtor Operating Agreement is $673,699 by Allerand, LLC, which is

---

[21] This leaves for another day whether I can enter a final judgment on avoidance actions brought against non-creditors.

[22] SWZ Ex. C (Second Amended and Restated Limited Liability Company Operating Agreement of United Tax Group, LLC) ("Debtor Operating Agreement"); SWZ Ex. E (Affidavit of Richard J. Sabella in Support of Defendants' Summary Judgment Motions ("Sabella Aff.")) ¶ 13.

[23] SWZ Ex. E (Sabella Aff.) ¶ 2; Trustee Ex. H (4/19/16 Dep. Tr. Richard J. Sabella) 13:14-21.

[24] SWZ Ex. C (Debtor Operating Agreement) ¶ 9; SWZ Ex. E (Sabella Aff.) ¶ 2; Trustee Ex. H (4/19/16 Dep. Tr. Richard J. Sabella) 13:14-16. This entity is not to be confused with the several other entities with similar names, particularly: Allerand Capital, LLC and Allerand 10 W 10 LLC (together with Allerand, LLC, the "Allerand Affiliated Entities").

[25] SWZ Ex. L (5/26/16 Dep. Tr. Edward Welke) 11:14-17. Welke is not a defendant in this adversary proceeding, but was sued by the Trustee in Adv. Pro. No. 16-50088.

[26] SWZ Ex. C (Debtor Operating Agreement).

[27] *Id.*

[28] SWZ Ex. C (Debtor Operating Agreement) Schedule A.

inclusive of Allerand, LLC's investment in FR Tax.[29]  On the Petition Date, Drouin, Bulyar and Mourgides no longer held a profit interest in United Tax; only Allerand, LLC and ECW remained members.[30]

Debtor was in the tax resolution business serving clients facing an array of tax-related problems.[31]  The tax resolution business was competitive and largely dependent on purchasing leads to obtain clients.  In early 2012, the three largest tax resolution firms in the country—Tax Masters, JK Harris and Ronnie Deutsch— "imploded" and United Tax viewed this as a growth opportunity.[32]  United Tax thought that less competition would equate to fewer purchasers bidding up the price of customer leads, resulting in lowering the cost to acquire clients and thereby increasing Debtor's revenue.[33]

In order to capitalize on this opportunity, United Tax needed growth financing and it turned to Allerand, LLC.[34]  In addition to its investment in United Tax, Allerand, LLC and other Sabella-affiliated entities operated a small business lending platform.[35]  Allerand, LLC created a draft term sheet and summary sheet for potential co-lenders ("Loan Participation Proposal").[36]  By the Loan Participation Proposal, Allerand Specialty Finance ("Allerand Specialty"), an affiliate of Allerand Capital LLC, offered an opportunity to invest in 80% of a senior secured loan facility capped at $1 million, with Allerand Specialty providing the

---

[29] SWZ Ex. C (Debtor Operating Agreement); SWZ Ex. E (Sabella Aff.) ¶ 13.  Notwithstanding their profit interests, none of ECW, Drouin, Mourgides or Bulyar are credited in the Second Amended LLC Agreement with a capital contribution.
[30] Statement of Financial Affairs, Question 21.b., Chapter 7 Voluntary Petition (Case No. 14-10486, D.I. 3-10).
[31] SWZ Ex. E (Sabella Aff.) ¶ 13.
[32] SWZ Ex. E (Sabella Aff.) ¶ 16.
[33] Trustee Ex. I (6/20/16 Dep. Tr. Richard J. Sabella) 144:18-145:10; SWZ Ex. E (Sabella Aff.) ¶16.
[34] SWZ Ex. E (Sabella Aff.) ¶ 16.
[35] *Id.*
[36] *See* SWZ Ex. E (Sabella Aff.) Exhibit A (Loan Participation Documents).

7

other 20% of the funding.[37]  Minimum investments were $100,000 and Allerand Specialty's

investment was to be subordinated to those of the other loan participants.[38]  The term of the

loan was to be 24 months with 13% interest and all of Debtor's current and future assets to

serve as collateral.[39]  The permitted use of loan proceeds included increasing United Tax's

advertising and marketing budget and returning $100,000 in capital to United Tax's original

equity investors.[40]

In or around early 2012, Sabella and Welke approached Gary Zentner as a potential

co-lender.[41]  Zentner is a private investor specializing in loans to small businesses that

cannot meet underwriting criteria for standard business loans.[42]  He has an MBA from the

Kellogg School at Northwestern University and was an investment banker on Wall Street

for twelve years before beginning his own business, Avalon National Corp ("Avalon").[43]

Zentner was familiar with United Tax as he received distributions under the United Tax

Group Dedicated Receivables Trust No. 1, which was a targeted marketing receivables trust

that purchased certain contract receivables from United Tax.[44]  Zentner also has a

"relationship" with Prism Venture Partners, another Sabella entity and the Administrative

---

[37] *Id.*

[38] *Id.*; SWZ Ex. E (Sabella Aff.) ¶ 18.

[39] SWZ Ex. E (Sabella Aff.) ¶ 16, Exhibit A.

[40] *Id.*

[41] *See* SWZ Ex. E (Sabella Aff.) ¶¶ 20-21; SWZ Ex. M (Affidavit of Gary Zentner in Support of Defendants' Summary Judgment Motions) ("Zentner Aff.") ¶ 6.

[42] SWZ Ex. M (Zentner Aff.) ¶ 4.

[43] *Id.*

[44] SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 29:18-32:15; SWZ Ex. E (Sabella Aff.) ¶ 13 ("until the funding of the UTG Loan in April 2012, UTG's operations were financed entirely by equity contributions from Allerand, LLC and occasional sales of its contract receivables.").

Trustee of Trust No. 1.[45] Further, as of January 12, 2012, Zentner was a principal of Allerand Specialty.[46]

Zentner performed significant due diligence on the investment opportunity, including: (i) interviewing each management executive and certain administrative and clerical staff; (ii) reviewing bank statements, tax service agreements with clients and United Tax's receivables; and (iii) reviewing the contractual arrangements (and the fairness thereof) between United Tax and Sabella-affiliated entities, including financial advisory and executive management agreements.[47]

After satisfying himself with respect to the investment opportunity, Zentner sent the Loan Participation Proposal to investors who had invested with him previously.[48] Zentner received positive responses from two investors—Peter Schreter and Andrew Caty—Canadian-based investors with investments in both Canada and the United States.[49] Zentner also received interest from his father, Max Zentner, who had invested with his son before (Schreter, Caty and Max Zentner, collectively, the "Participants").[50] Through their respective holding companies, PMS Enterprises, Inc. (Schreter), Gatex Properties, Inc. (Caty) and DG Capital, Inc. (the Zentners), each agreed to fund one-third of the loan offering subject to certain changes.[51] Those changes included that (i) Allerand Capital and

---

[45] See Trustee Ex. D (screenshot www.allerand.com/gary-zentner printed 10/11/2016 ), SWZ Ex. KK (Trust Agreement United Tax Group Dedicated Receivables Trust No. 1).

[46] See Trustee Ex. C (screenshot of Zentner's LinkedIn profile dated 10/11/16); Trustee Ex. D (screenshot www.allerand.com/gary-zentner printed 10/11/2016 ).

[47] SWZ Ex. M (Zentner Aff.) ¶¶ 7-10.

[48] SWZ Ex. M (Zentner Aff.) ¶ 10.

[49] Id.

[50] Id.

[51] SWZ Ex. I (United Tax Group Loan Participation Certificate and Agreement); see also SWZ Ex. H) (Final Statement SWZ Financial II, LLC Modern Business Checking Account); SWZ Ex. M (Zentner Aff.) ¶ 11.

9

Avalon would split the 20% "equity contribution" (i.e., the subordinated lending), such that Zentner would control the day-to-day operations of SWZ (the vehicle through which the loan would be funded) and (ii) Allerand, LLC would restore the $100,000 it received from the initial funding (as a return on its equity) in the event United Tax needed it.[52]

With an agreement in principle, Zentner retained the law firm of Greenspoon Marder, LP and worked with it to document the loan.[53] Greenspoon Marder drafted the material documents and United Tax's law firm, Nicol Jacoby LLP, commented on those documents and drafted required resolutions and ancillary documents required of United Tax.[54] To facilitate the transaction, on April 2, 2011, Defendant SWZ filed a certificate of formation with the Delaware Secretary of State.[55] SWZ is "a single purpose vehicle formed to syndicate interests" in the loan to United Tax.[56] The members of SWZ are Allerand, LLC, ECW and Avalon.[57]

Ultimately, the loan "(Loan)" was documented in a Credit Agreement between United Tax as Borrower and SWZ as Lender.[58] The Loan closed on April 11, 2012.[59] The complete set of closing documents includes: Credit Agreement, Promissory Note, Participation Agreements for each Participant, Recourse Carve-out Guaranty, Security Agreement, UCC-1 Financing Statements, Disbursement Instructions, and a Cooperation

---

[52] SWZ Ex. E (Sabella Aff.) ¶ 21; SWZ Ex. M (Zentner Aff.) ¶¶ 12-13.
[53] *See* SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 11:16-13:14; SWZ Ex. M (Zentner Aff.) ¶ 14.
[54] SWZ Ex. M (Zentner Aff.) ¶¶ 14-15.
[55] *See* SWZ Ex. G (Limited Liability Company Operating Agreement of SWZ Financial II, LLC.) ("SWZ Operating Agreement") Recitals.
[56] SWZ Ex. E (Sabella Aff.) ¶ 2; SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 8:21-24.
[57] *See* SWZ Ex. G (SWZ Operating Agreement) Schedule A. The capital interest in SWZ is split 50/50 by Allerand, LLC and Avalon, while the profit interest is split 40.001% to Allerand, LLC; 50.000% to Avalon; and 9.999% to ECW.
[58] SWZ Ex. A (Loan Documents); SWZ Ex. E (Sabella Aff.) ¶ 23.
[59] *Id.* ¶ 16; SWZ Ex. M (Zentner Aff.) ¶ 16.

Agreement.[60] Allerand, LLC also signed an Undertaking to repay and re-contribute to the capital of United Tax 105% of the amount of proceeds it received from the Loan if necessary for the continuation of Debtor's business.[61]

SWZ agreed to advance an aggregate principal amount not to exceed $1,000,000.00 with a fixed interest rate of 18% per annum.[62] United Tax owed interest-only payments for the first six months with the first interest payment due one month from the date of the Promissory Note ("Note"), or May 11, 2012.[63] Beginning month seven and for a period of 36 months thereafter, principal and interest payments were due on the monthly anniversary of the Note.[64] The Note became payable in full on a Termination Date as defined therein.[65] SWZ was granted a security interest in substantially all of United Tax's assets.[66] On April 11, 2012, a UCC-1 Financing Statement was filed with the Delaware Department of State.[67]

---

[60] SWZ Ex. A (Loan Documents).

[61] SWZ Ex. A (Loan Documents) Undertaking. The Undertaking of Allerand, LLC provides:
The undersigned, Allerand, LLC ("Allerand"), is a member of United Tax Group, LLC ("UTG"). Contemporaneously with the issuance by Allerand of this Undertaking, UTG is entering into a loan transaction with SWZ Financial II, LLC, as lender. It is anticipated that a portion of the proceeds of such loan will be used to repay certain capital contributions previously made by Allerand to UTG. By this Undertaking, Allerand undertakes and agrees, upon demand by UTG, to re-pay and re-contribute to the capital of UTG 105% of the amount of loan proceeds so paid to Allerand to the extent the same may be necessary or desirable for the conduct or continuation of UTG's business, it being understood that such re-payment and re-contribution may be made by affiliates of Allerand or by Allerand itself and may, in either case, take the form of cash contributions, assumption of indebtedness to third parties for the benefit of UTG or waiver of obligations owed by UTG to Allerand or any such affiliate. Allerand understands and agrees that the execution and delivery of this Undertaking is a material inducement for the distribution to Allerand of any portion of the loan proceeds referred to above.

[62] SWZ Ex A (Loan Documents) Credit Agreement.

[63] SWZ Ex. A (Loan Documents) Promissory Note.

[64] Id.

[65] Id.

[66] SWZ Ex. A (Loan Documents) Security Agreement.

[67] SWZ Ex. D (UCC-1 Financing Statement). The UCC-1 Financing Statement was amended that same day to correct Debtor's jurisdiction of organization.

11

Notwithstanding the $1,000,000 cap on the Loan, the initial funding was $501,000. To fund the Loan, SWZ entered into a certain United Tax Group Loan Participation Certificate and Agreement with each of DG Capital, Gatex and PMS by which each purchased a 26.6667% participation in the United Tax loan facility, thereby committing to fund $133,333.33.[68] Each of DG Capital, Gatex and PMS made their respective contributions and Allerand, LLC and Avalon each contributed $50,500.[69] Immediately upon closing, United Tax drew down $501,000.00.[70] At that time, United Tax had no long term debt, minimal current liabilities and receivables and work in progress on open client accounts of $650,000 in gross revenue potential.[71]

United Tax's prediction with respect to the future cost of lead-generation purchases did not pan out. Instead of less expensive lead costs, the exit of the three largest tax resolution companies from the market led to an exit of lead generating services as well thereby driving up the cost of leads.[72] By the spring of 2013, UTG was rapidly losing profitably.[73] In response, Sabella personally guaranteed a line of credit from Comenity Capital Bank to finance new internet sales lead purchases and Allerand, LLC made an additional cash infusion into United Tax.[74] Additionally, certain Allerand Affiliated Entities waived management fees and rent.[75]

---

[68] SWZ Ex I (United Tax Group Loan Participation Certificate and Agreement).
[69] SWZ Ex. H (Final Statement SWZ Financial II, LLC Modern Business Checking Account). This exhibit shows funding into SWZ's bank account as follows: Allerand, LLC: $50,500 (ii) Avalon: $50,500; (iii) Gatex: $133,342, (iv) PMS: $133,348 and (v) DG Capital: $133,333.33. SWZ Ex. M (Zentner Aff.) ¶ 17.
[70] To be precise, $19,855.00 in closing costs were withheld from the Loan proceeds, so Debtor drew down $481,145.00. SWZ Ex. M (Zentner Aff.) ¶ 18.
[71] SWZ Ex. M (Zentner Aff.) ¶ 19; SWZ Ex. E (Sabella Aff.) ¶ 14.
[72] SWZ Ex. E (Sabella Aff.) ¶ 24.
[73] SWZ Ex. M (Zentner Aff.) ¶ 20.
[74] SWZ Ex. E (Sabella Aff.) ¶ 25; SWZ Ex. M (Zentner Aff.) ¶ 20.
[75] SWZ Ex. E (Sabella Aff.) ¶ 25; SWZ Ex. M (Zentner Aff.) ¶ 20.

Ultimately, UTG's financial performance did not improve and, on November 4, 2013, SWZ declared United Tax in default under the Credit Agreement.[76] The decision to declare the default was made by Zentner as the managing member of SWZ through his entity, Avalon.[77] Prior to calling the default, Zentner consulted with the Participants but Zenter made the ultimate decision.[78] On November 15, 2013, Greenspoon Marder, on behalf of SWZ, filed a Complaint against United Tax in the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida.[79] By the Complaint, SWZ sought damages for breach of the terms of the Note asserting that United Tax then owed SWZ $329,361.11 plus interest.  SWZ also sought to foreclose on its collateral.[80]

After filing but before proceeding with the lawsuit, Zentner, Welke, Sabella, and Debtor's litigation counsel determined that immediate settlement would minimize losses to both SWZ and United Tax.[81] Just twelve days later, on November 27, 2013, SWZ and United Tax entered into a Stipulation of Settlement which was filed in the Florida court.[82] The Stipulation of Settlement was signed by SWZ's counsel, Mark K. Somerstein, Esquire of Greenspoon Marder, PA and Debtor's counsel, Michael D. Moccia, Esquire of the Law

---

[76] SWZ Ex. J (11/4/13 Letter from Greenspoon Marder to United Tax Group); SWZ Ex. E (Sabella Aff.) ¶ 25.

[77] SWZ Ex. M (Zentner Aff.) ¶ 20; SWZ Ex. E (Sabella Aff.) ¶ 25; SWZ Ex. L (5/26/16 Dep. Tr. Edward Welke) 100:10-15.

[78] SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 38:7-39:4; SWZ Ex. L (5/26/16 Dep. Tr. Edward Welke) 100:10-15.

[79] SWZ Ex. N (Stipulation of Settlement) Schedule A (Florida State Court Complaint Against United Tax).

[80] *See id.*

[81] SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 42:14-18; SWZ Ex. M (Zentner Aff.) ¶ 28; SWZ Ex. E (Sabella Aff.) ¶ 29.

[82] SWZ Ex. N (Stipulation of Settlement); SWZ Ex. E (Sabella Aff.) ¶ 26.

Office of Michael D. Moccia, PA.[83]  Zentner excluded both Sabella and Welke from SWZ's decision-making process regarding the foreclosure.[84]

Pursuant to the Stipulation of Settlement[85] SWZ agreed to forebear from further legal proceedings and Debtor acknowledged that it had no valid defenses to the complaint. Debtor further acknowledged that it was indebted to SWZ in the amount of $343,979.80 in principal, interest, costs and fees.[86]  SWZ agreed to release Debtor from any and all liability upon Debtor's performance of certain conditions, including the execution of an Assignment and Bill of Sale in Lieu of Enforcement and Foreclosure of Security Interest ("Bill of Sale")[87] by which Debtor transferred substantially all of its assets ("Foreclosed/Transferred Assets") to SWZ.  SWZ also assumed approximately $20,000 in obligations owed by Debtor to employees and counsel.[88]

### B.  Tax Help's Servicing of the United Tax Portfolio

In anticipation of the transfer of the Foreclosed/Transferred Assets, in November, 2013, Zentner approached Drouin about servicing Debtor's portfolio of tax resolution clients.[89]  Neither Sabella nor Welke were part of the communications between Zentner and

---

[83] *Id.*

[84] SWZ Ex. M (Zentner Aff.) ¶ 28.  There is some conflicting evidence on who drafted the Stipulation of Settlement.  Zentner testified that it was drafted by his counsel (SWZ Ex. M (Zentner Aff.) ¶ 28), but there is some evidence that the Stipulation of Settlement was on Sabella's computer (Trustee's Letter, D.I. 171 Exs. D, E).

[85] SWZ Ex. N (Stipulation of Settlement).

[86] *Id.*

[87] SWZ Ex. O (Assignment and Bill of Sale in Lieu of Enforcement and Foreclosure of Security Interest).

[88] SWZ Ex. N (Stipulation of Settlement).

[89] SWZ Ex. U (Drouin Aff.) ¶ 3; SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 39:12-40:14.

Drouin.[90]  Drouin owned his own tax resolution company, Tax Help, which is located in the same community as Debtor's offices.[91]

Drouin was familiar with United Tax because he was a founder of United Tax and owned a 12.003 percent profit interest prior to his departure in June 2012.[92]  At that time, United Tax was obligated to Drouin in the amount of $240,000 for services performed and to be performed by Drouin and KD Consulting (a Drouin entity).[93]  Pursuant to a letter agreement dated June 25, 2012 ("Termination of Consulting Agreement"), United Tax and Drouin agreed to terminate the consulting agreement between United Tax, KD Consulting Group and Drouin on agreed upon terms including a payment to Drouin of $110,000 over time as well as the forgiveness of $7,350 advanced to him.[94]  Other agreed terms related to (i) intellectual property, (ii) a cooperation/transition period, (iii) certain clients; (iv) non-solicitation/non-competition and (v) a release running in favor of United Tax.[95]

On November 29, 2013, SWZ and Tax Help executed an agreement ("Portfolio Servicing Agreement") under which Tax Help agreed to service United Tax's customers for SWZ.[96]  Tax Help charged fees on a sliding scale:  (i) 30% of actual gross collections until funds delivered to SWZ equaled $250,000; (ii) 40% once funds delivered to SWZ equaled $250,000; (iii) 50% once funds delivered to SWZ equaled $350,000; and (iv) and if SWZ realized $450,000, SWZ would assign to Tax Help SWZ's interest in Debtor's tax resolution agreements with its customers.[97]  In order to service United Tax's portfolio for SWZ, United

---

[90] SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 44:18-45:4.
[91] SWZ Ex. U (Drouin Aff.) ¶ 2.
[92] SWZ Ex. C (Debtor Operating Agreement) Schedule A; SWZ Ex. U (Drouin Aff.) ¶ 3.
[93] SWZ Ex. QQ (Affidavit of Richard J. Sabella) ("Supp. Sabella Aff.") ¶ 7.
[94] SWZ Ex. Q (Termination of Consulting Agreement).
[95] *See id;* SWZ Ex. QQ (Supp. Sabella Aff.) ¶ 7.
[96] SWZ Ex. P (Tax Service Agreement Portfolio Servicing Agreement).
[97] *Id.*

15

Tax needed access to Debtor's database, IRS Logics, on which Debtor maintained its client files. IRS Logics is a cloud-based system accessed by logging in with a valid password.[98] Tax Help was provided a password to United Tax's IRS Logics account.[99]

Based on Drouin's experience, he estimated the net value of the United Tax portfolio at $300,000:

> $550,000 (approximate gross value of receivables and contract payments)
> Less ($220,000) (40% loss factor for drop outs and bad debts)
> Less ($ 80,000) (25% cost to fulfill and collect on the agreements)
> Plus $ 50,000 (additional revenue generated by upselling United Tax customers)
> $300,000[100]

The actual results of Tax Help's collection efforts did not meet Drouin's expectations. Gross collections were only $128,776.60.[101] From the collections, SWZ received a total of $85,760.60 and Tax Help retained $43,016.60 in servicing fees.[102] All funds SWZ received from the proceeds of the foreclosure sale were first used to pay United Tax expenses that SWZ assumed in the Settlement Agreement and then to DG Capital, Gatex and PMS on account of their participation interests in the Loan.[103] Neither Allerand, LLC nor Avalon received any funds from the liquidation of the United Tax portfolio as their interests were subordinated to the return of investment to the Participants.[104] Each of DG Capital, Gatex and PMS are owed $58,581 in principal on their original $133,333 investment.[105]

---

[98] SWZ Ex. ZZ 14:12-16 (5/25/18 Dep. Tr. Dean Drouin). Tax Help is maintaining Debtor's IRS Logics database only because of this litigation; otherwise, Drouin would have shut down Debtor's system to avoid paying for it. *Id.* at 14:5-11.
[99] SWZ Ex. L (5/26/16 Dep. Tr. Edward Welke) 86:11-15.
[100] SWZ Ex. U (Drouin Aff.) ¶ 8.
[101] SWX Ex. S (IRS Logics Printout of Collections).
[102] *Id.*
[103] SWZ Ex. M (Zentner Aff.) ¶ 32; SWZ Ex. X (Client Payment Spreadsheet).
[104] *See id.*
[105] SWZ Ex. X (DB Capital/PMS/Gatex balances); SWZ Ex. M (Zentner Aff.) ¶ 33.

## C. Sarah Wonders

Sarah Wonders began working for United Tax on either October 30 or 31, 2011.[106] Her last day was May 18, 2012.[107] Almost since the beginning of her employment she encountered a hostile work environment. She verbally reported the hostile work environment to three individuals: Michael Mourgides, Adam Bulyar and Stewart Cooper.[108] She did not report the hostile work environment to anyone else nor did she put her complaints in writing until after she left United Tax.[109] On June 20, 2012, Wonders' lawyers wrote to Mourgides, Bulyar and Sabella asserting that she was constructively discharged and seeking to begin settlement discussions.[110]

On July 2, 2012, Wonders filed a charge of discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations and on February 6, 2013, she received a Notice of Right to Sue from the EEOC.[111] On February 13, 2013, Wonders filed a complaint against United Tax in the United States District Court for the Southern District of Florida.[112] On November 18, 2013, only nine days prior to Debtor's execution of the Stipulation of Settlement, Sarah Wonders obtained a judgment in the amount of $70,000; she was also seeking attorneys fees of $150,000.[113]

## D. Agreements with Allerand Affiliated Entities

Certain Allerand Affiliated Entities were counterparties to agreements with United Tax. Allerand 10W10 Company, LLC ("Allerand 10W10") leased office space to Debtor

---

[106] SWZ Ex. BB (6/26/13 Dep. Tr. Sarah Wonders) 19:13-19.
[107] Id.
[108] See e.g. id. 82:18-83:8.
[109] Id. 83:10-15.
[110] SWZ Ex. HH (6/20/12 Letter from Erika Deutsch Rotbart to Mourgides, Bulyar and Sabella).
[111] Trustee Ex. P (Plaintiff's Complaint and Demand for Jury Trial) ¶¶ 9-10.
[112] Id.
[113] Trustee Ex. F (2/26/14 email from Michael D. Moccia to Adam Hiller).

pursuant to that certain UTG Lease Agreement dated as of January 1, 2012.[114] Base rent was $5000 per month for the first year (indexed thereafter based on a governmental index) plus Florida taxes; tenant paid utilities. The rental payment is reflected in Debtor's bank statements as $6,000 per month starting May, 2012.[115] Sabella is the Managing Member of Allerand 10W10.[116]

Allerand Capital is a financial consulting company that provided a variety of management and financial consulting services to Debtor as detailed in that certain UTG Financial Consulting Agreement dated as of January 2, 2012.[117] In exchange for the provision of services, United Tax paid Allerand Capital a monthly fee of $10,000 per month. The monthly fee was increased as of August 1, 2012 to $15,000 per month as reflected in Debtor's bank statements.[118] As of October 11, 2016, Sabella was CEO and Founder of Allerand Capital and Welke, and Zentner were both principals.[119]

### E. Payments to/from Allerand, Allerand Affiliated Entities or other persons named in Trustee's Complaint

During the term of the Loan, UTG maintained one PNC Bank account used to collect fees from clients for services rendered[120] as well as make payments to creditors for services/goods provided to United Tax.[121] In calendar year 2012, Debtor paid the following

---

[114] SWZ Ex. II (UTG Lease Agreement).
[115] Trustee Ex. E (Debtor PNC Bank Statements).
[116] SWZ Ex. II (UTG Lease Agreement).
[117] SWZ Ex. JJ (UTG Financial Consulting Agreement).
[118] Trustee Ex. E (Debtor PNC Bank Statements).
[119] *See* Trustee Ex. D (screenshot www.allerand.com/gary-zentner printed 10/11/2016 ); *see also* Trustee Ex. C (screenshot of Zentner's LinkedIn profile dated 10/11/16). There is no evidence of the membership prior to 2016.
[120] SWZ Ex. E (Sabella Aff.) ¶ 15. Debtor's PNC Bank statements reflect the $50,000 payment the day before the Loan.
[121] *See generally* Trustee Ex E (Debtor PNC Bank Statements).

amounts to Allerand, Allerand Affiliated Entities or other persons named in Trustee's

Complaint and/or Answering Brief:[122]

| Allerand, LLC | $60,000 return on equity investment[123]<br>$100,000 from Loan proceeds |
|---|---|
| Allerand 10W10 | $78,000 under the UTG Lease Agreement<br>$15,000 labeled "loan expense" |
| Allerand Capital | $125,000 under the UTG Financial Consulting Agreement |
| KD Consulting Group | $7,350 labeled "sales expense"<br>$100,000 under the Termination of Consulting Agreement |
| Tax Help | $15,000 labeled "sales expense"<br>$458 labeled "Alex Bullard payment" |
| GZ Investco | $97,500 from Receivables Trust #2[124] |
| Caroline Welke | $32,500 from Receivables Trust #2[125] |

Allerand, LLC or Allerand Affiliated Entities made direct contributions of cash to

United Tax before the Loan and paid certain of Debtors' third-party obligations both before

and after the Loan.[126]  When United Tax began facing financial trouble in the spring of

2013, Allerand Capital waived the management fee (from February 1, 2013 forward) and

Allerand 10W10 waived the rent (from July 1, 2013 forward).[127]  Sabella also personally

guaranteed, and ultimately repaid, a loan to Debtor from Comenity Capital Bank in the

amount of $108,893.66.[128]

---

[122]  These figures come from Trustee Ex. E (Debtor PNC Bank Statements) unless otherwise noted.
[123]  SWZ Ex. E (Sabella Aff.) ¶ 13 (this appears to be inclusive of the $50,000 payment the day before the Loan.)
[124]  Trustee Ex. A (United Tax Group Deducted Receivables Trust No. 2 Modern Bank Account Statement); SWZ Ex. K (5/26/16 Dep. Tr. Gary Zentner) 29:18-30:4.
[125]  Trustee Ex. A (United Tax Group Deducted Receivables Trust No. 2 Modern Bank Account Statement).
[126]  SWZ Ex. GG (List of contributions made to Debtor).
[127]  SWZ Ex. E (Sabella Aff.) ¶ 25; SWZ Ex. GG (List of contributions made to Debtor).
[128]  Id.

19

## F. The Transfers/Repayment of the Loan

Debtors made payments on the Loan/Note from April 11, 2012 through October 11, 2013. As reflected in the Complaint, Debtors seek to avoid the following payments as either preferential or constructive fraudulent conveyances.

| Date | Account | Amount |
|------|---------|--------|
| 4/11/12 | Closing Fees | $19,855.00 |
| 5/11/12 | Interest Expense | $ 7,515.00 |
| 6/8/12 | Interest Expense | $ 7,765.50 |
| 7/9/12 | Interest Expense | $ 7,515.00 |
| 8/14/12 | Interest Expense | $ 7,765.50 |
| 9/10/12 | Interest Expense | $ 7,765.50 |
| 10/10/12 | -Split-[129] | $21,431.67 |
| 11/13/12 | -Split- | $21,466.46 |
| 12/10/12 | -Split- | $21,014.17 |
| 1/11/13 | -Split- | $21,035.04 |
| 2/11/13 | -Split- | $20,819.34 |
|  |  |  |
| 3/11/13 | -Split- | $19,956.60 |
| 4/11/13 | -Split- | $20,387.92 |
| 5/13/13 | -Split- | $19,970.42 |
| 6/10/13 | -Split- | $19,956.50 |
| 7/16/13 | -Split- | $19,552.92 |
| 8/15/13 | -Split- | $ 9,776.46 |
| 8/23/13 | Investor Loan from SW… | $ 5,000.00 |
| 9/10/13 | Interest Expense | $ 5,392.71 |
| 9/18/13 | Accounts Payable | $ 4,638.89 |
| 9/27/13 | Investor loan from SW… | $ 9,277.78 |
| 10/4/13 | Interest Expense | $ 5,010.00 |
| 10/11/13 | Accounts Payable | $ 4,638.89 |

Those transfers made within one year of the Petition Date (below the gray row, above) are the "One-Year Transfers" and those made within two years of the Petition Date are the "Two-Year Transfers." The Two-Year Transfers are inclusive of the One-Year Transfers.

---

[129] Trustee uses the word "-Split-," which is taken from the PNC Bank statements. I take this to mean principal and interest payments.

20

**The Parties' Positions**

To put it succinctly, Defendants believe this is a case of a failed business venture and an overzealous trustee. SWZ submits that Debtor's collapse was a result of the inability to expand the business as Debtor envisioned and emphasizes that neither SWZ nor the Participants recovered their initial investments.

Trustee contends that Defendants engaged in a multi-year scheme with the purpose of defrauding creditors. Trustee asserts that, as a result of this alleged scheme, Debtor's insiders received significant financial benefit to the detriment of Debtor's creditors. Trustee believes that the extensive fraudulent scheme resulted in over $3,000,000 in damages, which he seeks to bring back into Debtor's estate. While Trustee is precluded from raising claims sounding in actual fraud, he is now using his "sham" Loan theory defensively in response to SWZ's assertions of the ordinary course of business defense and in support of Trustee's contention that Debtor did not receive reasonably equivalent value for any of the Transfers.

**Legal Standard**

A court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[130] To do so, a movant may rely on material in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions and interrogatory answers.[131]

The court does not weigh evidence and determine the truth of the matter at the summary judgment stage; rather, the court determines whether there is a genuine dispute of

---

[130] Fed. R. Civ. P. 56(a) (applicable to adversary proceedings by Fed. R. Bankr. P. 7056).
[131] Fed. R. Civ. P. 56(c).

21

material fact.[132] A material fact is one which could alter the outcome of the case.[133] A dispute is genuine where "reasonable minds could disagree on the result."[134]

If the moving party shows that there is an absence of evidence supporting the nonmoving party's case, the burden of proof shifts to the nonmovant, who must offer "definite, competent evidence to rebut the motion."[135] It is not sufficient for the nonmoving party to merely reassert factually unsupported allegations from the pleadings.[136] Nor is a mere scintilla of evidence sufficient.[137] Where the nonmovant fails to provide evidence as to an essential element of its claim, summary judgment must be entered in favor of the movant.[138]

Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.[139] And, "[i]f a party . . . fails to

---

[132] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 213-214 (Bankr. D. Del. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[133] *Id.* (citing *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n 1 (3d Cir. 1995)).

[134] *In re U.S. Wireless Corp. Inc.*, 386 B.R. 556, 560 (Bankr. D. Del. 2008) (citing *Argus Mgmt. Group*, 327 B.R. at 210).

[135] *Miller v. Kirkland & Ellis LLP (In re IH 1, Inc.)*, No. 09-10982 (LSS), 2016 WL 6394296, at *8 (Bankr. D. Del., Sept. 28, 2016) (citing *Delta Mills, Inc. v. GMAC Commercial Fin. LLC. (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009)).

[136] *Miller*, 2016 WL 6394296, at *8.

[137] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986); *See also U.S. Wireless*, 386 B.R. at 560 (internal citations omitted) ("The requirement that the movant supply sufficient evidence carries a significant corollary: the burden of proof is switched to the non-movant who 'must present definite, competent evidence to rebut the motion.' Such evidence 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' Furthermore, evidence that 'is merely colorable or is not significantly probative' cannot deter summary judgment. In response, 'the non-moving party must adduce more than a mere scintilla of evidence in its favor;' it cannot simply reassert factually unsupported allegations contained in its pleadings. In other words, the non-moving party must do more than 'simply show that there is some metaphysical doubt as to the material facts.' Conversely, in a situation where there is a complete failure of proof concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.")

[138] *Miller*, 2016 WL 6394296, at *8; *U.S. Wireless*, 386 B.R. at 560 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

[139] *Miller*, 2016 WL 6394296, at *8.

properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment . . . if the movant is entitled to it."[140]

Further, while Trustee complained that the Motions were filed at the early stage of discovery, Trustee did not invoke Rule 56(d).[141]  I will not afford Trustee the protection of Rule 56(d) without the rule being specifically invoked and its procedural requirements observed.  Moreover, as detailed above, since the filing of the Motions, Trustee has been afforded two opportunities to supplement the record.  Accordingly, Trustee has had a full and fair opportunity to put forth evidence to defend against the Motions.

## Discussion

I.    **Summary Judgment is Appropriate on the Preference Causes of Action**

Counts I through III seek to avoid alleged preferences under section 547 of the Code. In pertinent part, § 547(b) provides:

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property –
> (1)  to or for the benefit of a creditor;
> (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3)  made while the debtor was insolvent;
> (4)  made –
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of filing of the petition, if such creditor at the time of such transfer was an insider; and

---

[140]  Fed. R. Civ. P. 56(e).

[141]  The Federal Rules of Civil Procedure specify what a nonmovant must do in such a scenario:
WHEN FACTS ARE UNAVAILABLE TO THE NONMOVANT.  If a nonmovant *shows by affidavit or declaration* that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.Fed. R. Civ. P. 56(d) (emphasis added).

Fed. R. Civ. P. 56(d).

     (5)  that enables such creditor to receive more than such creditor would receive if-

        (A) the case were a case under chapter 7 of this title;

        (B)  the transfer had not been made; and

        (C)  such creditor received payment of such debt to the extent provided by the provisions of this title.[142]

The burden is on the party seeking to avoid a transfer to establish each element by a preponderance of the evidence.[143] A creditor opposing a preference action can establish defenses under § 547(c), also by a preponderance of the evidence.[144] Accordingly, summary judgment is appropriate on Counts I through III if there are no material disputed facts with respect to either Trustee's failure to establish a necessary element of the cause of action or SWZ's establishment of an applicable defense.

### A. Summary Judgment is Appropriate on Count I Because Trustee Failed to Establish a *Prima Facie* case Under § 547

By Count I, Trustee seeks to avoid the One-Year Transfers made to SWZ. Defendants make five arguments supporting summary judgment: (i) that the Trustee has failed to state a cause of action that Debtor was insolvent at the time of each One-Year Transfer; (ii) that Trustee cannot satisfy § 547(b)(5) with respect to the One-Year Transfers because SWZ was a fully secured and perfected creditor; (iii) that the One-Year Transfers were made in the ordinary course; (iv) that recovery cannot be had from SWZ with respect to the One-Year Transfers because SWZ was a mere conduit of the transfers; and (v) that the closing fees were not transferred on account of an antecedent debt. I will address them in order.

---

[142] 11 U.S.C. § 547(b).

[143] *FBI Wind Down, Inc. Liquidating Trust v. Careers USA, Inc. (In re FBI Wind Down, Inc.)*, 614 BR 460, 474 (Bankr. D. Del. 2020) (citations omitted).

[144] *Id.*

### 1. At this stage of the case, summary judgment will not be granted based on failure to plead insolvency

SWZ first argues that summary judgment should be granted because Trustee failed to properly plead insolvency in his Complaint.[145] In the SWZ Opening Brief, however, SWZ states that for purposes of this motion "SWZ has not challenged any allegations made by the Trustee as to the 'insolvency' of the Debtor."[146] Perhaps there is an unexplained consistency between these two positions, and it may also be appropriate to move for summary judgment because of a pleading failure. But, given this stage of the proceedings and the existence of the Brownstein Report, which contains opinions on Debtor's solvency, summary judgment will not be granted on this basis.

### 2. SWZ did not receive more than it would have in a hypothetical chapter 7 case on account of the One-Year Transfers

SWZ next argues that the One-Year Transfers can be avoided as preferences only if SWZ received more on those transfers than it would have in a hypothetical liquidation under chapter 7 of the Bankruptcy Code. SWZ argues that it did not because it was a fully secured creditor with a perfected security interest in all of Debtor's assets. Specifically, SWZ asserts the security interest includes all proceeds from United Tax's service agreements with its clients, that all such proceeds were directed to one PNC Bank account, and that the PNC Bank account is the same account from which the One-Year Transfers were made to SWZ. SWZ cites to *In re Tri-State Telecommunications, Inc.*[147] for the proposition that payment to a secured creditor is not a preference.

---

[145] SWZ Opening Brief 12.

[146] SWZ Opening Brief 3.

[147] *Tri-State Telecommunications, Inc. v. First Fed. Sav. and Loan of Bucks Cty. (In re Tri-State Telecommunications, Inc.)*, Adv. No. 12-0377 (BF), 2012 WL 4904537, at *11 (Bankr. E.D. Pa. Oct. 15, 2012) ("[p]ayments to a creditor with a security interest in all of the debtor's assets cannot enable that secured creditor to receive more than it would receive in a chapter 7 case because, upon

Trustee does not dispute any of SWZ's facts or submit different or additional facts. Neither does he dispute the law. Rather, Trustee counters on two fronts. First, he argues that SWZ received more than it would in a hypothetical chapter 7 with respect to the One-Year Transfers because SWZ was a party to a "sham loan transaction." Second, Trustee contends that SWZ, Sabella and Allerand, LLC committed a fraud on the Florida court by failing to disclose their relationship with Debtor, presumably in connection with the Stipulation of Settlement. Trustee contends this should preclude SWZ from prevailing on the Motions.

### 3.  Trustee's contention that the Loan was a sham has no support in the record

In the preference section of Trustee's Answering Brief, Trustee uses the word "sham" as a label, but nowhere defines it. He does not cite to any cases discussing "sham" loans or for the proposition that a "sham" loan means that a defendant necessarily received more than he would in a chapter 7.[148] Accordingly, I turn to the descriptions in other portions of the Answering Brief and in the Brownstein Report to discern Trustee's "sham" loan contention.

---

liquidation of its collateral by the trustee, it would receive the proceeds until its claims was fully repaid.") (citations omitted).

[148] In Trustee's response to SWZ's ordinary course argument (discussed *infra*) he cites three cases for the proposition that the ordinary course of business defense does not apply to payments made by a "fake business" and Ponzi schemes. Answering Brief 19. Those cases and Trustee's characterization of them are: *Computer World Solution, Inc. v. Apple Fund, L.P. (In re Computer World Solution, Inc.)*, 427 B.R. 680, 689-90 (Bankr. N.D. Ill. 2010) (no characterization); *Jobin v. McKay (In re M&L Bus. Mach. Co.)*, 84 F.3d 1330, 1339-40 (10th Cir. 1996) ("determining that the ordinary course of business defense is not applicable to payments by a fake business set up to defraud people"); *Henderson & Buchanan*, 985 F.2d 1021, 1025 (9th Cir. 1993) ("concluding that the ordinary course of business is not applicable to Ponzi scheme investors because a Ponzi scheme is not a business"). Even by Trustee's standards, United Tax was neither a fake business nor a Ponzi scheme; it was a viable business. Answering Brief 3-4.

26

In his Answering Brief, Trustee explains his theory of the "sham" loan in this fashion:

> The Debtor was operating a viable company that was the subject of a sexual harassment claim by Sarah Wonders ("Wonders"). The Debtor's principal, **Sabella, created a sham loan to extract cash for the benefit of the Debtor's equity holders (and to the detriment of the holder of the sexual harassment claim)** in a fraud scheme. . . .Wonders was sexually harassed during the course of her employment with the Debtor. Her harassment continued for seven (7) months despite her continuous pleas to management to address her hostile work environment. After Wonders' many appeals to management went ignored, Wonders quit her job in May 2012. Knowing that the prospect of a sexual harassment lawsuit was imminent, in 2012, the Debtor paid out $593,208.00 to insiders and shareholders and encumbered all assets all while **purportedly borrowing** $501,000.00 from SWZ (the "SWZ Loan"). Allerand received $100,000 from the SWZ Loan and $150,000, the day before the SWZ Loan as distributions of equity. Allerand/Sabella received $350,000 in 2012 and $51,000 in 2013. The aforementioned transfers do not include the amounts taken by other insiders.
>
> These circumstances beg the question: why would a company need a loan for $500,000 at an interest rate of eighteen (18%) percent and no provisions allowing the company to cure a default, when in the calendar year 2012 it paid out almost $600,000 to insiders as fees and equity distributions? See Exh. A to SWZ MOL (Credit Agreement) at §§ 2.3, 9.1. **The answer to that question is simple: a company whose controlling insiders are trying to strip equity.** Moreover, the borrower **(the Debtor)** (i) was closely related to the lender (SWZ), (ii) **was committed to ensuring that Wonders would not obtain any satisfaction from the Debtor in her harassment suit, and (iii) wanted to retain control of the Debtor's operations.**[149]

Brownstein, Trustee's valuation expert, was retained ostensibly to opine on the value of Debtor's assets at various points in time and on Debtor's solvency. His report is devoted to supporting Trustee's narrative as much as it is to his actual opinions.[150] He calls the Loan the "centerpiece of a series of asset-stripping transactions Defendants initiated to defraud

---

[149] Answering Brief 3-4 (emphasis supplied).

[150] Brownstein's report contains many "facts" upon which Trustee seeks to rely for purposes of these Motions. Brownstein has no first-hand knowledge of any facts in this case. While an expert may base his opinion on facts or data in which an expert in the field would reasonably rely (Fed.R.Evid. 702), the underlying facts of the creation of trusts, or Wonders' employment are not such facts. Trustee in most cases did not submit any of the underlying documents supporting Brownstein's recitation of the facts or his conclusions.

creditors."[151] Brownstein includes in the asset-stripping transactions, two trusts that predate the Loan,[152] the Termination of Consulting Agreement between United Tax and Drouin, the Loan, the Foreclosure and SWZ's entry into the Portfolio Servicing Agreement with Tax Help. The import of the Brownstein Report is that the entire asset-stripping scheme, including entry into the Loan, was a specific reaction to Wonders' claims: "**Wonders was first a potential liability, later a threatened liability and finally a judgment creditor; the Chronology indicates liability to Wonders either motivated the Defendants' larger plan to defraud creditors or drove the course and timing of Defendants [sic] specific transactions.**"[153] As for the necessary exit for the scheme, Brownstein offers:

> And stripping cash from such an operation required an **exit strategy** to offload obligations to clients, and eliminate exposure to class action lawsuits or other legal claims via Chapter 7 bankruptcy. **Buying Drouin out of [United Tax]. . . supporting establishment of Tax Help, and delivering the foreclosed customer contracts to Tax Help in advance of [United Tax's] Chapter 7 filing, provided such an exit.**[154]

Distilled to its essence, in order to believe Trustee's sham Loan theory, a rationale trier of fact would need to conclude at least four things: (i) Sabella orchestrated the Loan beginning in January, 2012 because of Wonders and a *potential* sexual harassment claim; (ii) Drouin left United Tax in June 2012 so that he could receive the United Tax portfolio in a future foreclosure (iii) the Loan and the contemplated exit scheme involving Drouin was for the primary benefit of insiders and (iv) in the meantime, United Tax did not pay any of its

---

[151] Brownstein Report 8.
[152] SWZ Ex. KK (Trust Agreement United Tax Group Dedicated Receivables Trust No. 1). This Trust Agreement is dated as of July 22, 2011. There is no evidence of the creation date of Trust No. 2, but Brownstein states a date of September 14, 2011.
[153] Brownstein Report 46 (emphasis in original).
[154] Brownstein Report 13 (emphasis supplied). Trustee also attributes Drouin's departure from United Tax as part of the scheme. Answering Brief 12 ("In furtherance of the fraudulent scheme, Dean Drouin left the Debtor in June 2012, after the fraudulent loan was made by SWZ to the Debtor and after Wonders quit her job.").

28

creditors. There is simply no evidence in the record that the Loan or Drouin's departure

from United Tax were driven by Wonders' employment or lawsuit. Further, the evidence

belies any argument that the impetus behind the Loan was to benefit insiders. What the

evidence does show is:

- Trust # 1 and Trust # 2 (both of which Brownstein suggests were a lesser ambitious part of the asset-stripping scheme)[155] were created as of July 22, 2011 and September 14, 2011, respectively. Wonders began employment with United Tax on October 30 or 31, 2011.

- In early 2012, Sabella and Welke approached Zentner regarding a potential lending opportunity, which culminated in the Loan executed on April 11, 2012. The Loan was negotiated by Zentner and documented by lawyers for both parties.[156] The Loan contains a provision subordinating recoveries for Allerand, LLC and Avalon to the Participants in the Loan. The Loan also contains a provision requiring Allerand, LLC to undertake to return the $100,000 paid to it as a return on equity if necessary to Debtor's operations. Allerand, LLC honored the Undertaking.

- SWZ loaned $501,000 to United Tax.

- Ninety percent of the loan was funded by non-insiders. Even counting Avalon and DG Capital as insiders[157] slightly over one-half of the loan was funded by non-insiders.[158] There is no evidence that Gatex and PMS are insiders.

- Wonders first notified Sabella of her claims on June 20, 2012. While Wonders is clear that she notified Mourgides, Bulyar and Cooper of the hostile work environment prior to the execution of the Loan, she is equally clear that she did not notify anyone else. There is no evidence that Mourgides, Bulyar or Cooper informed Sabella, or Welke.

---

[155] Brownstein Report 25 ("the complexity and pretenses Defendants employed to extract $46,500 from [United Tax] via Trust # 2 is useful context as one analyzes the SWZ Loan, a more ambitious asset-stripping scheme.").

[156] At oral argument, Trustee's counsel stated that there was evidence that Sabella was on both sides of the Loan transaction in testimony provided on other contested matters in the bankruptcy case. Over objection, Trustee was given permission to supplement the record with citation to the transcript, page and line numbers of such testimony. The supplementary evidence pertains entirely to the foreclosure; it does not address the making of the Loan.

[157] There is no evidence that Zentner is an insider. In each of his dealings with Debtor, he or his entity is a creditor. Further, Zentner has no ownership interest in or control over Debtor.

[158] Trustee has no response to the participation of these independent investors.

- Dean Drouin left United Tax in June, 2012. There is no evidence that Drouin was advised of Wonders' complaints of a hostile work environment.

- Drouin left United Tax in June 2012 and the foreclosure did not occur until November 2013. There is no evidence that Drouin or Tax Help served as an exit for some asset-stripping scheme. Moreover, there is no evidence that the United Tax portfolio was transferred to Tax Help. Rather, the evidence is that SWZ foreclosed on the portfolio, which was then serviced by Tax Help pursuant to the Portfolio Servicing Agreement. While servicing required access to United Tax's IRS Logics database, there is no evidence that the database, itself, was transferred to Tax Help. Rather Tax help was provided a password to access the database.

- There is no evidence that Drouin or Tax Help had any incentive not to maximize the United Tax portfolio or that they did not do so.

- There is no evidence that Sabella, Zentner or Welke has any ownership interest in Tax Help. Nor is there any evidence of any side agreement between Drouin and/or Tax Help and any of Sabella, Zentner or Welke.[159]

I see no dispute of material fact with respect to the *bona fides* of the Loan. Further, there is no evidence that the Loan was designed to defraud creditors, particularly Wonders, even if it permitted funds to go out to equity holders. Nor, is there any evidence that during the course of the Loan, United Tax failed to pay its debts as they came due. While Wonders was not paid, the only evidence submitted with respect to outstanding obligations shows minimal non-affiliated, third-party debt, some of which was subsequently paid by Allerand, LLC or Sabella.[160] Moreover, Debtor's bank statements for calendar year 2012 show regular monthly payments to trade creditors.

In further support of its "sham" Loan argument Trustee states, repeatedly, that in calendar year 2012, Debtor paid out $593,208 to insiders and shareholders as follows: (i)

---

[159] *See* SWZ Ex. L (5/26/16 Dep. Tr. Edward Welke) 16:2-17:2.
[160] Trustee Ex. Q (Schedule F – Creditors Holding Unsecured Nonpriority Claims). Schedule F shows $621,736 in total claims. Excluding claims of Allerand Affiliated Entities, Comenity Capital Bank and Wonders, unsecured non-priority claims total $84,512.54. The size and type of claims do not evidence a failure to pay debts over time and do not create a disputed material fact.

Allerand, \$350,000, (ii) KD Consulting Group (a company owned by Drouin), variously \$97,750 or \$112,750; (iii) Tax Help, \$15,458 (iv) GZ Investco \$97,500 and (v) Caroline Welke \$32,500.[161] Presumably, this is meant to show that the Loan was simply a means to funnel money to equity. But, Trustee's failure to attribute any payments to the separate Allerand Affiliated Entities for rent and management fees, his failure to attribute payments to GZ Investco and Caroline Welke as related to Trust #2 and his failure to recognize that payments to KD Consulting Group of \$112,750 resolved a \$240,000 obligation, is misleading. There is no evidence that the rent or management fees were above market. The only evidence on this score is that the fees were market.[162] Further, a review of the PNC Bank statements for calendar year 2012 show that these payments are only a relative handful of the payments made to creditors in the 53 pages that comprise those bank statements.

Finally, in both the Answering Brief and at argument Trustee contends that he is entitled to inferences that Sabella knew of the hostile work environment and that the Loan was for the benefit of insiders. A nonmovant is entitled to the benefit of inferences, but the inferences may not be "drawn out of the air."[163] It is incumbent on the nonmovant to first "produce a factual predicate from which the inference may be drawn."[164] As here, when the nonmoving party fails to produce direct evidence, an inference is only permissible if it is reasonable in light of other facts already established in the record.[165] Trustee did not

---

[161] Answering Brief 12-13, 34.
[162] SWZ Ex. M (Zentner Aff.) ¶ 9.
[163] *Mayweathers v. Terhune*, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004).
[164] *Id.* (citing *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).
[165] *See e.g. Matsushita Elec.*, 475 U.S. at 587-588.

establish the factual predicate that is required before an inference must be drawn and his

inferences are directly contrary to the record established on the Motions.

Trustee's and Brownstein's attempt to force a narrative surrounding the Loan simply

has no support in the record.[166]

### 4. There is no evidence of a fraud on the Florida court

Similarly, there is no evidence in the record that SWZ, Sabella and/or Allerand,

LLC committed a fraud on the Florida court. Trustee asserts that they "failed to disclose

their relationship with the Debtor to the Florida court in the Foreclosure Action."[167]

Trustee does not cite to anything to support this statement or point me to any part of the

record. The only evidence in the record of what was put before the Florida court is the

Stipulation of Settlement. There is no evidence regarding what other documents may have

been placed before the Florida court, what proceedings may have occurred or what

proceedings are necessary or required under Florida law to carry out a foreclosure.

Assuming *arguendo* that fraud on the Florida Court would be relevant with respect to

the One-Year Transfers (Trustee cites no legal authority for this proposition), there are

simply no facts to support this position.

There are no material facts in dispute with respect to the fifth element of a preference

action. SWZ is entitled to summary judgment on Count I.

---

[166] There is one document that caused me pause. Brownstein attached to his report a pro forma analysis that he says was produced by SWZ during the course of discovery. Brownstein states it purports to show that the Loan would go into default fourteen months after it was made. He questions why a lender would lend on this pro forma. Trustee did not mention the pro forma report in his Answering Brief or at argument nor did he attach it as a separate exhibit. Trustee points to no evidence about its origin, what it is supposed to mean, how it was used by United Tax or SWZ or whether there are other pro forma analyses. More importantly, it does not create a dispute with respect to any of the facts set forth *supra*.

[167] Answering Brief 17.

### 5. The One-Year Transfers were made in the ordinary course

SWZ also seeks to dismiss Count I because the One-Year Transfers were made in the ordinary course of business. A payment is made in the ordinary course if it

> was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was --- (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms.[168]

SWZ argues that it can avail itself of the defense because the Loan was an arms-length transaction involving third-party Loan Participants, the Loan was documented in a customary fashion, contained customary terms and both Debtor and SWZ were represented by counsel. Further, payments on the Loan were due on the 11th of the month and the One-Year Transfers "show a regular course of payment" between the 8th and 16th of the month.[169] Citing cases within the circuit and district, SWZ contends that the payment pattern meets the ordinary course standard.[170]

Trustee does not take on SWZ's recounting of the facts. Rather, Trustee once again relies on its "sham" Loan argument. For the reasons set forth above, that argument is unavailing.

Trustee also contends that SWZ cannot avail itself of this defense because it is an insider. SWZ's status as an insider is not fatal as case law is clear that the ordinary course of business defense is still available to insiders. For example, in *U.S. Medical,* the creditor had a 10.6% equity interest in the debtor and creditor's CEO held a seat on the debtor's

---

[168] 11 U.S.C. § 547(c)(2).

[169] There are a few exceptions, but Trustee does not challenge this characterization. Indeed, at argument, Trustee's counsel candidly conceded that if I conclude the Loan is not a sham, then the Two-Year Transfers were in the ordinary course.

[170] SWZ Opening Brief 16-17. *In re Opus East LLC,* 528 B.R. 30 (Bankr. D. Del. 2015); *In re Molded Acoustical Prods.,* 18 F.3d 217 (3rd Cir. 1994); *Sass v. Vector Consulting, Inc. (In re American Home Mortgage Holdings, Inc.),* 476 B.R. 124 (Bankr. D. Del. 2012).

board.  Notwithstanding, the Bankruptcy Appellate Panel concluded that the ordinary course defense is available to insiders.[171]  Trustee's case law is not to the contrary.

Trustee relies on one case, *Prevalence Health*,[172] which he says stands for the proposition that "courts have recognized that inherent with insider loans is an informational advantage which the non-insider creditor does not have which makes the transfers anything but ordinary."[173]  But *Prevalence Health* does not establish a bright line rule that the ordinary course of business defense is unavailable to insiders.  The court's decision was narrow, finding that demand notes payable to debtor's president and chief operating officer gave rise to unusual collection efforts and payment practice because the president knew when the time was right to make demand for payment.  In coming to this conclusion, the court distinguished the facts before it from the "typical debtor and creditor relationship" where a promissory note requires payments in regular installments to an unrelated third party.  Further, the court conducted a fulsome ordinary course analysis.  If the court was establishing or following a bright line rule, there would have been no need for such an analysis.[174]

Here, Trustee points to no unusual collection efforts.  Unlike *Prevalence Health*, the Loan and Note are not payable on demand.  Rather, notwithstanding the unchallenged

---

[171] *U.S. Medical*, 531 F.3d at 1280 (emphasis added) (discussing statutory and non-statutory insiders and ruling that "[t]he 'ordinary course of business' defense is still available for any transactions between a non-statutory insider and a debtor as well as for transactions between a statutory insider and a debtor that are in 'the ordinary course of business'—transactions that must be at arm's length."); *see also In re Bayonne Medical Center*, 429 B.R. 152 (Bankr. D. N.J. 2010) (establishing a creditor as an insider does not preclude utilization of the ordinary course of business defense).

[172] *Lefoldt v. Anthony (In re Prevalence Health, LLC)*, Adv. No. 1100068 (EE), 2012 WL 5430993 (Bankr. S.D. Miss. Nov. 7, 2012).

[173] Answering Brief 19.

[174] *See also Sklar v. Susquehanna Bank (In re Global Protection USA, Inc.)*, 546 BR 586, 615-618 (Bankr. D. N.J. 2016) (court engaging in an extended discussion of the ordinary course of business defense notwithstanding creditors' insider status).

34

insider nature of the transaction, the evidence shows that the Loan was negotiated at arms-length, documented appropriately, secured and was paid monthly in accordance with its terms.

SWZ has met its burden on the ordinary course of business defense. There are no material facts in dispute. SWZ is entitled to summary judgment on Count I on this basis as well.

### 6. There are material facts in dispute with respect to whether SWZ was a mere conduit

SWZ next moves for summary judgment on Count I stating that it was a conduit with respect to all of the challenged transfers because it only owned 10% of the Loan. SWZ contends that the Participants and Avalon owned 90% of the Loan and that SWZ was contractually obligated under the Loan documents to pass through funds that it received from Debtor. In other words, SWZ argues that it did not exercise the requisite control over the funds received from Debtors because it could not use the funds at its discretion.

In support of this argument, SWZ points to: (i) language in the Participation Agreements that reference the purchase of a piece of the loan; (ii) each Participant's contractual right to receive a portion of the interest and principal payments made on the Loan; and (iii) SWZ's obligation to remit to each Participant an amount equal to its share of all principal and interests payment made no later than three days after receipt. SWZ relies most heavily on *Brooke Corp.*[175] in which the court held that a lead bank was just a conduit for transfers that it forwarded to participants who owned their piece of the loan repaid by preferential transfers.

---

[175] *Brooke Corporation v. The Stockton Nat'l Bk. (In re Brooke Corp.)*, 458 B.R. 579 (Bankr. D. Kan. 2011).

35

Trustee argues that there are material facts in dispute regarding whether SWZ had dominion and control over funds it received from Debtor. Trustee points to provisions in the Participation Agreements that provide SWZ with a liquidation preference on amounts advanced and SWZ's ability to redirect distributions in the event of an acceleration and enforcement of remedies. Trustee also notes that there is no provision requiring the payment of principal and interest to be held in trust and there are no provisions addressing a foreclosure event.

I conclude that there are material facts in dispute as to whether SWZ was a conduit. In particular, I note that no party has addressed the Undertaking of Allerand, LLC or the Recourse Carveout Guaranty made by Sabella and Welke for the benefit of SWZ. The import of cases cited by both parties with respect to the mere conduit issue is that the conduit receives no benefit from the portion of the transfer passed through to third parties and therefore is just a recipient, not a transferee. Here, SWZ, or certainly its members, may have received a benefit from the transfers passed through to Participants either through satisfaction of or lessening liability on their guarantees and/or prolonging any obligation under the Undertaking. Further, it is not clear from the SWZ bank statements exactly what funds were used to pay the Participants versus other obligations and/or whether the interest and principal payments received by SWZ were strictly passed through.

Accordingly, summary judgment is not appropriate on this basis.

### 7. The closing fees were not transferred on account of an antecedent debt

On the closing of the Loan, Debtor paid the closing fees of $19,855 by a reduction in the amount of Loan proceeds deposited in Debtor's account. SWZ contends that the fees

36

were customary closing fees simultaneously transferred at the closing and therefore not in payment of an antecedent debt.

Trustee's only response is that "there had to have been an agreement to pay the fees - written or oral – which arose prior to the parties' arrival at the closing table,"[176] but he points to no portion of the record in support of this contention. At the summary judgment stage, this is not good enough. As to the closing fees, summary judgment is appropriate because Trustee has not proven an element of his case—an antecedent debt.[177]

Ultimately, no dispute of material fact exists to preclude summary judgment on Count I. I recommend that the District Court enter Judgment in favor of Defendant on Count I.

## B. Summary Judgment is Appropriate on Count II Because the Security Interest was Granted and Perfected Outside of the Longest Preference Period

By Count II, Trustee seeks to avoid the Security Interest, which is defined in the Complaint to mean the security interest granted to SWZ under the Credit Agreement. SWZ argues that there are no disputed material facts with respect to the perfection (and presumably the grant) of a security interest under the Credit Agreement. For purposes of this Motion, SWZ does not dispute that it is an insider, but it argues that the perfection of its security interest in substantially all of Debtor's assets occurred 693 days prior to the Petition Date, well outside of even the longest preference period. Alternatively, SWZ argues that the

---

[176] Answering Brief 24. Trustee also responds to an argument not made, that there was not a transfer. *Id.* In response, SWZ argues that the closing fees were a contemporaneous exchange. Given my ruling, I need not address the contemporaneous exchange defense.

[177] The transfer of the closing fees also occurred outside of the preference period. SWZ did not raise this argument.

Security Agreement and the Delaware UCC-1 were executed contemporaneously with the making of the Loan and so there was no antecedent debt.

I find no direct response to this argument in Trustee's Answering Brief nor did Trustee address this issue at oral argument. Further, SWZ's position on the timing of the grant and perfection of the Security Interest is consistent with the documentary evidence submitted. Accordingly, I conclude that there are no facts in dispute and recommend that summary judgment be granted in Defendant SWZ's favor on Count II.

## C. Summary Judgment is Appropriate on Count III as Trustee has Not Met his Burden to Show That § 547(b)(5) is Satisfied

In Count III, Trustee seeks to avoid the transfer of the Foreclosed/Transferred Assets as a preferential transfer. SWZ has multiple arguments as to why the foreclosure does not constitute a preferential transfer or that any preferential transfer should be excused, including that: (i) the value of the property SWZ received in the foreclosure did not exceed the value provided to Debtor; (ii) the collateral was liquidated in a commercially reasonable manner; (iii) Trustee should be estopped from asserting damages due to Trustee's unclean hands; (iv) the preference action was an attempt to wrongfully elicit a quick settlement from Defendants; (v) Trustee's intentional withholding of mail from SWZ damaged both the estate and SWZ, and Trustee's supervening acts render any damage calculations totally speculative; (vi) SWZ was a mere conduit with respect to $63,000 of the proceeds it received from Tax Help from its collection of the Foreclosed/Transferred Assets, and finally, (vii) because SWZ was a secured creditor, SWZ did not receive more than it would have in a liquidation.

In support of these arguments, SWZ states that the outstanding balance on the Loan at the time of the Foreclosure was $343,979.80, that it released a deficiency claim of

38

$20,000.00 and therefore any hypothetical liquidation value must exceed $363,979.80 in order for Trustee to satisfy his burden. As the liquidation of the Foreclosed/Transferred Assets yielded just $85,750.60 to SWZ, SWZ received significantly less than it was due on the Loan. SWZ also disputes the $3,000,000 value placed on the assets by Trustee in the Complaint claiming he has no support for this value.

Trustee responds that (i) the value of the Foreclosed/Transferred Assets exceeds the amount of the Loan relying in his Answering Brief on the Trustee's back of the envelope calculation of $3 million in damages and, after supplementing the record, on the Brownstein Report; (ii) estoppel is not a defense to a cause of action and, in any event, Trustee's hands are clean; (iii) SWZ is acting in bad faith; (iv) there were no supervening acts of Trustee which could render damages speculative; (v) SWZ is not a mere conduit and, finally (vi) SWZ was not a fully secured creditor and received more than it would have in a chapter 7 liquidation.

Of the myriad arguments on Count III, I will address only one: whether there is a material fact in dispute with respect to whether SWZ received more than it would have in a hypothetical chapter 7 case on account of the Foreclosed/Transferred Assets. SWZ's other arguments, many of which are unsupported by case law, would appear not to be a defense to a preference action, an estate cause of action not dependent on the intent of any actor.[178]

The hypothetical liquidation analysis of § 547(b)(5) asks the court to consider what a creditor would have received if the transfer did not take place and, instead, the creditor received payment of his debt via the distribution scheme of chapter 7.[179] The end result is a

---

[178] I have already addressed the "mere conduit" argument and would come to the same result here.
[179] 11 U.S.C. § 547(b)(5).

comparison of the value the creditor received in the transfer with the distribution the creditor would have received in the hypothetical chapter 7 liquidation if the transfer had not been made. While courts appear to be split regarding whether to value a creditor's secured claim as of the transfer date or the petition date (an issue not raised here), courts appear uniform that the value of the chapter 7 estate is made as of the petition date.[180]

As recited in the Procedural Posture section above, at the conclusion of the initial briefing on the Motions, I expressed the view that there was nothing in the record to support Trustee's $3 million valuation. I specifically stated that valuation testimony could go to two issues—reasonably equivalent value (for purposes of a constructive fraudulent conveyance argument) and the hypothetical liquidation analysis (for purposes of a preference analysis). Trustee asked for and was given permission to supplement the record with an expert report and to pursue discovery of Tax Help in order to prepare that report. Trustee subsequently submitted the Brownstein Report as an exhibit to his supplemental brief.

Scour the Brownstein Report as you like, there is no valuation of the Foreclosed/ Transferred Assets as of the Petition Date, March 5, 2014. Instead, and as discussed fully *infra*, Brownstein values Debtor's business as of the *first calendar quarter of 2012* (before the Loan) at a range of $3.3 to $3.8 million. He values Debtor's business *in June, 2012* (when Drouin left United Tax) at $1.6 to $1.7.[181]

---

[180] *See e.g. Seitz v. Yudin (In re Cavalier Indus., Inc.)*, No. 99-31737 (DWS), 2002 WL 975868, at *3 (Bankr. E.D. Pa. April 16, 2002) (collecting cases).

[181] At argument, Trustee's counsel argued that Brownstein's valuation was actually as of the foreclosure date—November 27, 2013. That contention is addressed below, but counsel did not argue that Brownstein valued United Tax or the Foreclosed/Transferred Assets as of the Petition Date. Further, Brownstein's valuation dates are too far from the Petition Date to be meaningful especially in light of the changed circumstances in the tax resolution industry as set forth *supra*.

As Trustee has provided no evidence of the value of the estate as of the Petition Date, he has not met his burden to respond to the Motions on Count III. I recommend that summary judgment be granted in favor of Defendant SWZ on Count III.

## II. Summary Judgment is Appropriate on Count VI: Constructive Fraudulent Conveyance under Section 548 of the Bankruptcy Code

In Court IV of the Complaint, Trustee asserts that Two Year Transfers and the transfer of the Foreclosed/Transferred Assets were both constructive fraudulent conveyances under § 548(a)(1)(B) of the Bankruptcy Code.[182] A constructive fraudulent conveyance is a statutory construct; it does not focus on debtor's intent but rather hinges on whether the debtor received reasonably equivalent value for the transfer. The party seeking

---

[182] Section 548(a)(1)(B) provides:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation;
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such a transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

41

to avoid a constructively fraudulent transfer bears the burden of proof that all elements of §548(a)(1)(B) are met.[183]

The Bankruptcy Code does not define reasonably equivalent value. The Third Circuit has ruled that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"[184] This is a "common sense" inquiry that requires a court to analyze the totality of the circumstances.[185] And, it is a factually intense inquiry.[186]

Because the Two-Year Transfers and the Foreclosed/Transferred Assets are fundamentally different types of transfers, I will address them separately.

## A. The Two-Year Transfers were in Payment of an Antecedent Debt and thus for Reasonably Equivalent Value

The Two-Year Transfers are transfers to SWZ in repayment of the Loan. Citing *Crucible Materials*,[187] SWZ contends that when the challenged preference is a dollar-for-dollar satisfaction of an antecedent debt, there can be no constructive fraudulent conveyance. Trustee's argument is a little convoluted as he toggles back and forth between the Two-Year Transfers and the Foreclosed/Transferred Assets and also picks up elements of actual fraud, a theory not pled. But, Trustee appears to argue that the Two-Year Transfers cannot be for reasonably equivalent value because the Loan (which the transfers repaid) was a sham, that

---

[183] *Mellon Bank v. Official Committee of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 144 (3d. Cir. 1996); *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 210 (3d Cir. 2006).

[184] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *Fruehauf Trailer* at 213).

[185] *Jalbert v. McClelland (In re F-Squared Investment Mgmt., LLC)*, Case No. 15-11569 (LSS), 2021 WL 3533377, at *5 (Bankr. D. Del. Aug. 10, 2021) citing *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003).

[186] *Charys Liquidating Trust v. McMahan Securities Co., L.P. (In re Charys Holding Co., Inc.)*, 443 BR 628, 638 ("reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

[187] *Gellert v. Coltec Industries (In re Crucible Materials Corp.)*, Adv. No. 11-53884 (MFW), 2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012).

42

"SWZ and Debtors" were on both sides of the Loan transaction and that payments to insiders do not enjoy the presumption that payment of an antecedent debt is not a constructive fraudulent conveyance.

I have already ruled against the "sham" Loan argument and to the extent it is not obvious so far, I do not find that SWZ and Debtors were on both sides of the Loan transaction.   The testimony is unrefuted that Zentner negotiated the Loan on behalf of the to-be formed entity, SWZ.  SWZ negotiated terms that protected it as a creditor, including the Undertaking, and it took a secured position.  Each of Debtor and SWZ had its own counsel and Debtor received $500,001 in new money.  Notwithstanding Trustee's protestations, there is zero evidence in this record that Debtors and SWZ were on both sides of the Loan transaction.

As for the presumption that the satisfaction of antecedent debt is reasonably equivalent value, Trustee has cited nothing to rebut that presumption.  Trustee's case law is off point.  Both *Atlanta Shipping*[188] and *Southern Industries*[189] apply the then-current version of the New York Debtor and Creditor Law not § 548 of the Bankruptcy Code.  The New York Debtor and Creditor Law incorporated a good faith element which has since been repealed.[190]  Further, *Southern Industries* (upon which *Atlanta Shipping* relies) is not the repayment of a Loan, but rather the transfer of all the assets of a debtor for an antecedent debt.  That scenario is distinguishable from the Two-Year Transfers.  Finally, as SWZ points out, the drafters of the Bankruptcy Code knew how to single out insiders when relevant to the constructive fraudulent conveyance provisions; §548 (a)(1)(B)(IV) specifically

---

[188] *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 248-49 (2d Cir. 1987).

[189] *Southern Indus. v. Jeremias*, 66 A.D.2d 178 (N.Y. Supreme App. Div., 2nd Dep't 1978).

[190] *See* N.Y. Debt. & Cred. Law § 272, Value, Supplementary Practice Commentaries ("the new law eliminates the issue of the transferee's good faith" as an element of "reasonably equivalent value.").

calls out insiders with respect to employment contracts – and even then, only employment contracts not made in the ordinary course of business. Finally, Trustee's counsel candidly conceded at argument that if I do not adopt Trustee's "sham" loan theory, the ordinary course defense prevails.

Here, the Two-Year Transfers repaid a debt on a promissory note decreasing, dollar for dollar, the amount owed to SWZ. This is not a constructive fraudulent conveyance under § 548 of the Bankruptcy Code.

**B. Trustee has Failed to show That United Tax Received Less than Reasonably Equivalent Value for the Foreclosed/Transferred Assets**

### 1. SWZ is not entitled to a presumption of reasonably equivalent value on the Foreclosure/Transferred Assets

The Foreclosed/Transferred Assets pose a different scenario. While the foreclosure was based on an antecedent debt, there are disputed material facts as to whether Sabella—a member of both Debtor and SWZ— was on both sides of this transaction. While SWZ submitted a significant quantum of evidence with respect to the negotiation of the Loan, there is scant evidence on the foreclosure. The evidence is that Zentner ultimately made the decision to call the default on the loan and retained counsel for SWZ to file the complaint. Exactly who made the decision to enter into the Stipulation of Settlement is not clear. Further, the supplementary evidence supplied by Trustee shows that there is some indication that Sabella drafted the Stipulation of Settlement, a contention he denies.

As, if not more, important, the Stipulation of Settlement is not like a promissory note nor a financing lease, as in *Crucible Materials*. The Stipulation of Settlement and corresponding Bill of Sale transferred to SWZ the Foreclosed/Transferred Assets which are Debtor's agreements with its customers. The value of those agreements is hotly contested

44

and (unlike the Two-Year Transfers) must be monetized.  If the Foreclosed/Transferred

Assets were worth substantially more than the remainder of the Loan balance of

$343,979.80, then Debtor did not receive reasonably equivalent value.  SWZ's argument

that the repayment of the Loan through the foreclosure is dispositive is not persuasive.

### 2. The Brownstein Report does not value the Foreclosed/Transferred Assets as of the date of transfer

SWZ contends that the Foreclosed/Transferred Assets were worth only what it

received from Tax Help, namely $85,760.60.[191]  Prior to the Brownstein Report, Trustee

relied on his own $3 million back of the envelope analysis.  He also argued that SWZ's

value cannot be given any weight because of the incompetence and mismanagement of

SWZ and Tax Help in monetizing the Foreclosed/Transferred Assets.[192]  I need not

determine whether SWZ's value is correct because Trustee has the burden to show that

Debtor received less than reasonably equivalent value as an element of its affirmative case.

Unfortunately for Trustee, the Brownstein Report does not supply the missing valuation

evidence because it focuses on the wrong dates.

It is well settled that the critical date to determine reasonably equivalent value is the

date of the transfer.[193]  The Foreclosed/Transferred Assets were transferred on November

27, 2013.  But, the Brownstein Report values Debtor at two different dates – the first quarter

of 2012 and as of June 25, 2012.  Brownstein's valuations are contained in his "Chronology

with Analysis," which walks the reader through United Tax from August 28, 2009 through

May 16, 2014.  As Brownstein explains:

---

[191] SWZ Ex. S (SWZ payment report); SWZ Ex. B (SWZ Financial II LLC Bank Statement).
[192] Answering Brief 35.
[193] *See Peltz*, 279 B.R. at 737 ("for purposes of considering reasonable equivalence, the critical date is the date of the transfer at issue"); *Morris Communications NC, Inc. v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1988) (same).

critical transactions and events in this case cluster around three periods of time: the SWZ Loan (funded April 11, 2012); the Drouin buyout (June 25, 2012) aka termination of the KD Consulting Agreement; and Foreclosure of SWZ's security interest in UTG's customer contracts (November 25-27, 2013). Accordingly, we have chosen to present analysis pertinent to those transactions within the Chronology.[194]

Brownstein first provides a business valuation for United Tax based on its financial statements as of March 29, 2012. This valuation, injected into Brownstein's Chronology and Analysis, is under the date April 11, 2012, the day the Loan was funded.[195] To emphasize the time frame of the valuation, Brownstein specifically states that the analysis is "pertinent to the timeframe surrounding the SWZ Loan."[196] Consistent with this timing, the Table reflecting Brownstein's analysis draws its base numbers from Debtor's profit and loss figures from January 1 though March 29, 2012, which are then annualized. Based on these numbers, Brownstein opines to a valuation of $3.3 million to $3.8 million. There is nothing to suggest that this valuation is for any time period other than what it appears to be—the time of the Loan.

Brownstein's next valuation of the company appears in his Chronology and Analysis under the date June 25, 2012, the date Drouin's Termination of Consulting Agreement was executed. Brownstein bases this analysis on United Tax's buyout of Drouin's 12.003% interest in United Tax. After making certain assumptions and taking into account a minority discount, Brownstein opines to a "value of $1.67 million, based on the Drouin buy-out effectuated via the Termination of Consulting Agreement."[197] Again, there is

---

[194] Brownstein Report 21.
[195] Brownstein Report 27, 35.
[196] *Id.*
[197] Brownstein Report 37.

46

nothing to suggest that this valuation is for any time period other than what it appears to be—the time of Drouin's departure from United Tax.

The Brownstein Report does not provide any other valuations. But, the Chronology and Analysis continues. It contains specific entries for: (i) November 25, 2013, the date Debtor executed the Bill of Sale assigning all assets to SWZ; (ii) November 27, 2013, which contains a description of the terms of the Stipulation of Settlement; and (iii) November 29, 2013, the day that SWZ and Tax Help executed the Portfolio Servicing Agreement and the day on which ("if not before"), Tax Help had access to Debtor's IRS Logics system to "track and continue to work on UTG's former clients."[198] Notwithstanding his chronicling of the foreclosure, there is no valuation of the company following these entries.

Brownstein's opinions as stated in his "Opinions and Conclusions" reiterates his valuations and the dates thereof. He opines:

1. **Based on UTG's financial statements for the first calendar quarter of 2012, after the Two Year Transfer date and *prior to the SWZ Loan*, indicate a value for the business of $3.3 million - $3.8 million.**[199]

2. **The second major step in Defendants' assets stripping scheme was the buyout of Drouin's ownership interest two plus months after the SWZ Loan for consideration indicating *Defendants valued UTG as it then existed*, post SWZ Loan, post-significant cash distributions at $1.6 - $1.7 million, to which might be added the amounts previously and subsequently extracted by Defendants.**[200]

When confronted by this reality at argument, Trustee's counsel contended that these valuations were really as of November 27, 2013. The only hook that counsel could point to was the use of the word "extrapolating" on page 11 of the Brownstein Report. The argument is that Brownstein used the first calendar quarter 2012 numbers and extrapolated

---

[198] Brownstein Report 43.
[199] Brownstein Report 45 (emphasis supplied)
[200] *Id.*

47

the run-rate EBITDA to arrive at a value of $3.3 million to $3.8 million as of November 27, 2013. But, this makes no sense when reading the words in context or in the context of valuation. A review of the use of the word "extrapolating" in context does not show that Brownstein was valuing the company as of November 27, 2013. The paragraph at issue, as well as the preceding and following paragraphs all reference the Loan, not the foreclosure. Moreover, it stains credulity to believe that an expert would use financials from the first quarter of 2012 to determine the value of a company in the last quarter of 2013 particularly when there is no evidence that more current financials do not exist.

At argument, Trustee's counsel also argued that his extrapolation argument created a material issue of fact that precludes summary judgement and requires trial. Counsel argued that because he read the Brownstein Report differently that SWZ and I do that Brownstein must be permitted to explain his report and/or that this is the stuff of cross-examination. I am not persuaded. Brownstein's opinion is clear, and it is what it is. Permitting Brownstein to testify that he meant something other than he wrote is, charitably speaking, giving him an opportunity to rehabilitate his own opinion. Further, if as Trustee's counsel alternatively argued, Brownstein's Report is less than clear (which I do not find it to be), then Trustee has not met his burden.

The simplest explanation is the best one. The valuations in the Brownstein Report are exactly what they appear to be. They are contained in the Chronology of Analysis under the dates of April 11, 2012 and June 25, 2012 and they are based on financial information gleaned from those respective time periods. Brownstein has not provided a value for the assets as of the date of the foreclosure and accordingly Trustee has not produced any evidence of an element of his action under § 548 of the Bankruptcy Code.

48

I recommend that summary judgment be entered in SWZ's favor on Count IV.

**III.  Summary Judgment is Appropriate on Trustee's Causes of Action Under Florida's Uniform Fraudulent Transfers Act**

Counts V-VII of the Complaint seek avoidance of the Two-Year Transfers and the Foreclosed/Transferred Assets as constructive fraudulent transfers under Florida's Uniform Fraudulent Transfers Act ("FUFTA").[201] Preliminarily, I note two things. First, there was very little citation by either party to cases discussing FUFTA. I did not conduct independent research, but have merely addressed the arguments and defenses as presented. Second, the parties lumped arguments on these Counts together, which was sometimes confusing. I have done my best to parse through the combined presentations to determine which arguments are relevant to each Count.

**A. Summary Judgment is Appropriate on Count V of the Complaint**

By Count V, Trustee seeks to avoid the Two-Year Transfers and the Foreclosed/Transferred Assets pursuant to FUFTA §726.105(1)(b), which provides that a transfer is fraudulent as to a present or future creditor if the debtor did not receive reasonably equivalent value in exchange for the transfer when such debtor's remaining assets were insufficient in relation to the business or it was about to incur debts beyond its ability to pay.[202]

---

[201] The Florida fraudulent conveyance statute tracks the Uniform Fraudulent Transfer Act as opposed to the Uniform Fraudulent Conveyance Act.

[202] Fla. Stat. § 726.105(1)(b) provides:
Transfers fraudulent as to present and future creditors.
(1) a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
    (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

SWZ has multiple bases for summary judgment: (i) lack of standing for failure of a triggering creditor; (ii) Florida law protects transfers that result from the enforcement of a security interest; (iii) Trustee received reasonably equivalent value; (iv) estoppel due to Trustee's unclean hands; (v) protection under the ordinary course of business defense as to the Two-Year Transfers; and (vi) SWZ was a mere conduit. I address below those arguments that merit discussion and have not yet been discussed.

### 1. There is a triggering creditor for Count V

As a gating issue, SWZ argues that in order for Trustee to have standing to pursue its state law claims for avoidance of the Two-Year Transfers, Trustee must identify and plead the existence of an actual creditor who, under state law, could set aside the transfer. Section 544(b)(1)(A) provides in relevant part:

> the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title . . . [203]

As to Count V, this requirement is met. Section 726.105(1)(b) permits a creditor to avoid a transfer whether his claim arose *before or after* the transfer was made. For purposes of this FUFTA section, a plaintiff need only identify a creditor who held an unsecured claim as of the petition date.[204] As Trustee points out, Wonders easily meets this requirement. She holds an unsecured claim against the estate.

---

1. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
2. intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

[203] 11 U.S.C. § 544(b)(1)(A).
[204] *Compare In re Sandburg Mall Realty Management LLC*, 563 B.R. 875, 897 (Bankr. C.D. Ill. 2017) (applying same section of Uniform Fraudulent Transfer Act as adopted in Illinois).

### 2. Summary Judgment is not appropriate on Count V based on an argument that SWZ enforced its Security Agreement

SWZ contends that under Florida law the enforcement of a security interest protects the transfer of the Foreclosed/Transferred Assets from avoidance. SWZ cites only to the statute, without replicating it in its brief, and cites no Florida law interpreting it at all—much less with respect to enforcement as part of a foreclosure of all of the assets of a debtor. For the reasons set forth above, there are issues of material fact in dispute with respect to the foreclosure. Thus, summary judgment is not appropriate on this basis.

### 3. Debtor received reasonably equivalent value for the Two-Year Transfers and the Brownstein Report did not value the Foreclosed/Transferred Assets as of the foreclosure date

SWZ argues that the Two-Year Transfers are not avoidable under § 726.105(1)(b) because Debtor received reasonably equivalent value in exchange for the payments on the Loan. Under Florida law, Trustee has the burden of proof.[205] Both parties rely on their previous arguments with respect to reasonably equivalent value and do not raise any different arguments under Florida law. For the reasons set forth above, I once again conclude that Debtor received reasonably equivalent value for the Two-Year Transfers as the transfers reduced, dollar-for-dollar, antecedent debt.

As for the Foreclosed/Transferred Assets, the parties also rely on their previous arguments. For the reasons set forth above, I once again conclude that the Brownstein Report did not value the Foreclosed/Transferred Assets as of the foreclosure date and therefore there are no material facts in dispute with respect to this factor on which Trustee has the burden of proof.

---

[205] *Perlman v. American Express Centurion Bank*, No. 19-61386 (RS), 2021 WL 2598139, at *7 (Bankr. S.D. Fla. Mar. 31, 2021).

51

### 4. The Two-Year Transfers were made in the ordinary course of business

SWZ argues that the Two-Year Transfers were made in the ordinary course of business for purposes of the Florida statute.[206] SWZ contends that the Two-Year Transfers (excluding the One-Year Transfers) were made between the 8th and the 14th of the month and the One-Year Transfers "show a regular course of payment" between the 8th and 16th of the month.[207] Trustee's only response is that "because this action involves fraudulent transfers made by insiders, there is nothing 'ordinary' about the dealings at issue."[208]

For the reasons set forth above, I conclude that there are no material facts in dispute. The Two-Year Transfers, inclusive of the One-Year Transfers, were made in the ordinary course of business.

I recommend that summary judgment be entered in favor of SWZ on Count V.

### B. Summary Judgment is Appropriate on Count VI of the Complaint

By Count VI, Trustee seeks to avoid the Two-Year Transfers and the Foreclosed/Transferred Assets under FUFTA § 726.106, which permits creditors with claims that arose *before* the transfer at issue to avoid a transfer if the debtor did not receive reasonably equivalent value and was insolvent when the transfer was made.[209] While SWZ raises many grounds for summary judgment, I need determine only two.

---

[206] SWZ contends that the Florida statute does not require that the debt be incurred in the ordinary course of business only that transfer be made in the ordinary course of business. SWZ Opening Brief 37. Trustee does not respond to this contention.

[207] In fact, a few of the One-Year Transfers fall outside this range.

[208] Answering Brief 44.

[209] Transfers fraudulent as to present creditors.
(1) a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

### 1. There is a triggering creditor

First, SWZ once again raises the lack of identification of a triggering creditor. SWZ argues that in order for Trustee to have standing to pursue its state law claims for avoidance of the Two-Year Transfers, Trustee must identify and plead the existence of an actual creditor who, under state law, could set aside the transfer. Unlike § 726.105(a), § 726.106(2) requires that the creditor have a claim that arose *before* the transfer at issue. As to the Two-Year Transfers, SWZ argues that "Trustee seeks to avoid two dozen separate transfers that occurred over more than a two-year period and he has not identified even a single triggering creditor."[210] Trustee has two arguments in response. First, he asserts that Debtor's schedules filed with the petition show the existence of many creditors whose claims are listed as having arisen in 2012.[211] Second, he asserts that Wonders had a claim from the beginning of her employment in October, 2011 because the hostile work environment occurred almost from the inception.

When the underlying state law fraudulent transfer statute forming the basis of the §544(a) cause of action provides that only an existing creditor may avoid the transfer, the predicate creditor must hold a claim at the time of the transfer and as of the petition date.[212] The question, then, is whether any of the creditors scheduled on Debtor's Schedule F held claims as of April 11, 2012, the date of the earliest Two-Year Transfer and/or whether Wonders had a claim at that time.

---

[210] SWZ Opening Brief 32.

[211] *See* Trustee Ex. Q (Schedule F, Creditors Holding Unsecured Nonpriority Claims).

[212] *Sandburg Mall Realty*, 563 B.R. at 897; *see also Giuliano v. U.S. Nursing Corp., (In re Lexington Healthcare Group, Inc.)*, 339 B.R. 570, (Bankr. D. Del. 2006) ("The Trustee must eventually prove the existence of a specific creditor whose claim existed at the time of the alleged overpayments and on the petition date, but is not required to do so at this [pleading] stage in the process.") (applying Connecticut Uniform Fraudulent Transfer Act).

As for Debtor's Schedule F, Debtor listed many creditors with a claim date of "2012-2013," however, each of them is also listed as contingent, unliquidated and disputed. These creditors are not eligible to be triggering creditors based on Schedule F as their claims would not be "allowable" for purposes of § 544. As for creditors whose claims are not listed as contingent, liquidated or disputed, the earliest date a claim was incurred is "8/2013" (Comenity Capital Bank). Therefore, Comenity Capital Bank can be a triggering creditor for transfers after August, 2013.

As for Wonders' claim, while neither party cited a case on point, I conclude that Wonders had a claim at least as of April 11, 2012. For this analysis, the relevant dates are: (i) October 30 or 31, 2011, the date she was hired; (ii) May 18, 2012, the date Wonders resigned/was constructively discharged; and (iii) June 20, 2012, the date her lawyers wrote to Debtor asserting the hostile work environment charge. There is no question that Wonders had a claim,[213] as of June 20, 2012, the date her lawyers asserted her claims in written form. I also conclude that Wonders had a claim against United Tax on May 18, 2012, the date she was constructively discharged, which was only one month before her lawyers put the claim in writing. And, I further conclude that Wonders had a claim against United Tax at least as of April 11, 2012, just two months before her lawyers put her claim in writing. In Wonders' deposition, Debtor's lawyers walk Wonders through her filed Complaint, paragraph by paragraph, asking Wonders to re-tell her workplace experience. She details sexual harassment from the inception of her job, providing concrete examples of

---

[213] Claim means "[r]ight to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101 (5)(A).

the hostile work environment on specific dates, from January 30, 2012 through May 18, 2012.[214] Wonders' judgment confirms the claim is valid and "allowable" for purposes of § 544. Therefore, Wonders can serve as the triggering creditor for Count VI.

### 2. Debtor received reasonably equivalent value

Trustee raises no new arguments with respect to reasonably equivalent value. I have already determined that there are no material facts in dispute with respect to reasonably equivalent value. The Two-Year Transfers were payments made on account of an antecedent debt—the Loan—and reduced the Loan on a dollar-for-dollar basis. And, Trustee did not submit any evidence to show that Debtor received less than reasonably equivalent value with respect to the Foreclosed/Transferred Assets. Accordingly, summary judgment is appropriate on Count VI.

### C. Summary Judgment is Appropriate on Count VII Because: (i) the Two-Year Transfers Made before March 5, 2013 are Time-Barred; (ii) the Two-Year Transfers were Made in the Ordinary Course and (iii) Trustee has no Evidence on Damages Related to the Foreclosed/Transferred Assets

By Count VII, Trustee seeks to avoid the Two-Year Transfers and the transfer of the Foreclosed/Transferred Assets pursuant to § 726.106(2) of the Florida statute which permits avoidance of a transfer to an insider if it was made for an antecedent debt, the debtor was insolvent when the transfer was made and the insider had reasonable cause to believe that the debtor was insolvent.[215] As previously, SWZ does not argue that it is not an insider so it is subject to this section of FUFTA. But, SWZ raises three arguments that require

---

[214] SWZ Ex. BB (6/26/13 Dep. Tr. Sarah Wonders), passim; Trustee Ex P (asserting specific conduct on January 30, 2012, February 9, 2012, February 27, 2012, February 29, 2012, March 8, 2012, March 16, 2012, March 30, 2012, April 12, 2012, May 11, 2012 and May 18, 2012.)
[215] Transfers fraudulent as to present creditors.
(2) a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

discussion: (i) that Trustee's claim is time barred; (ii) that the transfer was made in the ordinary course of business of the debtor and the insider; and (iii) that there was no harm to existing or future creditors.[216]

### 1. Only Two-Year Transfers made before March 5, 2013 are time-barred

SWZ contends that any claim under §726.106(2) must be brought within one year of the challenged transfer or it is barred.[217] Trustee does not challenge that a cause of action under this section must be brought within one year. Where the parties disagree is over when the challenged transfers were made.

SWZ contends that the relevant date for all the challenged transfers is April 11, 2012, the date that Debtor granted a security interest in all of Debtor's assets (and, in particular, Debtor's contracts and accounts receivable) to SWZ. In making this argument, SWZ relies on FUFTA § 726.107 which provides that for purposes of this section, a transfer is made "with respect to an asset that is not real property or that is a fixture, when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under ss. 726.101-726.112 that is superior to the interest of the transferee." SWZ argues that once the UCC-1 was filed perfecting the security interests granted to SWZ, a creditor could not acquire an interest superior to SWZ's in any of the transferred assets.

Trustee contends that the relevant date for the challenged transfers is the date on which each of the Two-Year Transfers was actually made and, with respect to the

---

[216] Wonders is a triggering creditor here.

[217] Fla. Stat. § 726.110 ("A cause of action with respect to a fraudulent transfer or obligation under ss. 726.101-726.112 is extinguished unless action is brought: . . . (3) Under s. 726.106(2), within 1 year after the transfer was made or the obligation was incurred."); *See also Paragon Health Services, Inc. v. Central Palm Beach Community Mental Health Center, Inc.*, 859 S.2d 1233 (Fla.App. 4 Dist. 2003) (one year statute of limitations extinguishes any cause of action under § 726.106(2) based on a transfer that occurred more than one year prior to the filing of the complaint).

Foreclosed/Transferred Assets, November 27, 2013, the date the Settlement Stipulation was executed. He relies on a different section of FUFTA, § 726.102(14), which defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting *with an asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Trustee further argues that subsequent transfers made in connection with enforcement of a security interest can occur on a date different than the perfection date of the underlying security interest. In support of this proposition, Trustee cites *Venice-Oxford*[218] in which the court ruled that for purposes of §547 and §548 of the Bankruptcy Code and FUFTA §726.105 and §726.106(1), the relevant date of transfer of rents to a mortgagee was the date a court entered a final judgment of foreclosure and ordered that rents be provided to the foreclosing party, not the date upon which the pledge of rents was perfected.[219]

I agree with Trustee and the *Venice-Oxford* Court. The transfer challenged in Count VII is not of the security interest in Debtor's assets; that was the subject of Count II. Count VII challenges the payments made on the Loan and the transfer of the ownership interest in Debtor's assets. These subsequent events are different transfers than the original grant of a security interest in Debtor's tax servicing agreements with its clients. As to the Two-Year Transfers, they occurred when Debtor made the payment. The transfer of cash only occurs when the cash is paid (or, upon the effective date of a check or wire transfer). It is at that time that "the transfer is so far perfected" that another creditor cannot obtain an interest superior to that of the recipient of the cash. Similarly, the transfer of Debtor's *ownership*

---

[218] *In re Venice-Oxford Assocs. Ltd. Partnership v. Multifamily Mortgage Trust 1996-1*, 236 B.R. 820, 828 (Bankr. M.D. Fla. 1999).
[219] *Venice-Oxford*, 236 B.R. at 828, 836. The court did not specifically analyze §726.106(2).

*interest* to SWZ through the Settlement Agreement is different than Debtor's previous transfer of a *security interest* in its assets.[220] The transfer of ownership only occurs when title is transferred. Title to the Foreclosed/Transferred Assets occurred when the Settlement Agreement and Bill of Sale were executed.

The Two-Year Transfers made after March 5, 2013 and the transfer of the Foreclosed/Transferred Assets were made within one year of the Petition Date. Accordingly, summary judgment is not appropriate as to those transfers. But, the Two-Year Transfers made before March 5, 2013 are time-barred and summary judgment is appropriate as to those transfers.

Having determined that most of the transfers are not time barred, the question is whether SWZ asserts any other viable defenses.

### 2. The Two-Year Transfers were made in the ordinary course of business

SWZ also argues that the Two-Year Transfers were made in the ordinary course of business under FUFTA, which SWZ points out does not require that the debt be incurred in the ordinary course, but only that the payments be made in the ordinary course of business. Trustee has no new response. For the reasons set forth above, I conclude that the Two-Year Transfers were made in the ordinary course of business.

### 3. Trustee has not provided any evidence of damages related to the foreclosure of the Foreclosed/Transferred Assets

SWZ is not challenging Debtor's solvency for purposes of these Motions. On the surface, then, it would appear that summary judgment must be denied on Count VII. But,

---

[220] If ownership of assets subject to a security interest are transferred, the new owner may take them subject to the security interest, but the new owner has title nonetheless. Further, if SWZ is correct, then foreclosures occurring more than four years after a loan could never be challenged as a fraudulent conveyance. This cannot be the law.

58

there is a larger issue at play here. SWZ has contended from the beginning that Trustee has nothing to support his demand for $3 million in damages in the Complaint. Trustee was provided with the opportunity to supplement the record with evidence to support his damages claim, but he failed to do so. Accordingly, even if material facts exist with respect to Debtor's solvency on the date of the transfer, there is no basis to award damages on this record.

I recommend that summary judgment be entered in SWZ's favor on Count VII.

## IV.   Summary Judgment is Appropriate on Counts VIII, IX and X as there are No Transfers to Avoid

Section 550 of the Bankruptcy Code permits a trustee to recover transfers avoided under § 547 or § 548 of the Bankruptcy Code.[221] FUFTA also provides for the recovery of avoided transfers.[222] Before a trustee can recover, however, the transfer must first be avoided. Because summary judgment is being granted on Counts I-VII, no relief is available under Counts VIII – X and, therefore, summary judgment is appropriate for Counts VIII, IX, and X.[223]

---

[221] 11 U.S.C. § 550(a) provides in pertinent part:
Except as otherwise provided in this section to the extent that a transfer is avoided under section[s] [547 or 548] of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from –
    (1)    the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2)    any immediate or mediate transferee of such initial transferee.

[222] Fla. Stat. § 726.108 provides in pertinent part:
In an action for relief against a transfer or obligation under ss. 726.101-726.112, a creditor, subject to the limitations in s. 726.109 may obtain:
    (a)    Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; . . .

[223] SWZ also made substantive arguments that in no event was Tax Help responsible for any avoided transfers as it did not exercise control and dominion over any of the Foreclosed/Transferred Assets. I agree. Debtor transferred the Foreclosed/Transferred Assets to SWZ by way of the Settlement Agreement and Bill of Sale. SWZ entered into a contractual arrangement with Tax Help to service Debtor's/SWZ's portfolio. While Tax Help accessed Debtor's IRS Logics database to

## V.   Summary judgment is appropriate on Counts XI and XII

By Counts XI and XII, Trustee seeks judgment against Allerand, LLC for breach of

fiduciary duty and Sabella for aiding and abetting Allerand, LLC's breach of fiduciary duty.

The Trustee alleges in Count XI that Allerand, LLC breached its fiduciary duties to

Debtor by causing Debtor to transfer the security interest, the Two-Year Transfers and the

Foreclosed/Transferred Assets to SWZ.  Allerand, LLC contends that Debtor's Operating

Agreement includes an exculpatory provision waiving all fiduciary duties owed by members

save for willful misconduct.

Pursuant to the Delaware Limited Liability Company Act, a member's duties to a

limited liability company may be expanded, restricted, or eliminated by provisions in the

company's operating agreement.[224]  Paragraph 10 of Debtor's operating agreement provides:

> The Members shall not be liable or accountable, in damages or otherwise, to
> the Company or to any other Member for any error of judgment or for any
> mistake of fact or law or for anything it may do or refrain from doing
> hereafter in connection with the business and affairs of the Company, except
> in the case of willful misconduct.  The Company shall indemnify the
> Members, any partner, member, shareholder, director, officer, proprietor,
> trustee, employee or agent of a Member, and each affiliate of a Member (the
> "Indemnified Persons") from all loss, damage and liability incurred by reason
> of anything an Indemnified Person has done or refrained from doing in
> connection with the business and affairs of the Company (INCLUDING
> ANY LOSS, DAMAGE, EXPENSE, OR LIABILITY CAUSED BY OR
> ATTRIBUTABLE TO THE ORDINARY OR GROSS NEGLIGENCE OF
> THE INDEMNIFIED PERSON AND FOR ANY ACTION FOR WHICH
> THE INDEMNIFIED PERSON MAY INCUR STRICT LIABILITY)
> except in the case of willful misconduct.  The provisions of this Section shall

---

service the portfolio, there is no evidence that Debtor's customers or the database were within Tax Help's dominion and control (as opposed to SWZ's).

[224] Del. Code Ann. tit. 6, § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

be enforceable to the fullest extent permitted by the Act, as it may be hereafter amended (but, in the case of any amendment, only to the extent that such amendment permits broader indemnification rights than the Act allowed before such amendment).  The Company's obligations under this Section shall be limited to assets of the Company, and no Member shall be required to make any capital contribution in respect thereof.[225]

Trustee relies on the Chancery Court's decision in *Feeley*[226] to challenge the degree to which Debtor's exculpatory clause waives Allerand, LLC's duties to Debtor.  In *Feeley*, the court found that an exculpatory provision in an operating agreement, "(i) assumes that default fiduciary duties exist, (ii) limits only the potential availability of a monetary remedy, not the potential for injunctive or other equitable relief, and (iii) restores the availability of damages as a remedy for, among other things, gross negligence and willful misconduct."[227]  Trustee contends that Debtor's operating agreement does not waive anything.

Trustee's reliance on *Feeley* is misplaced as the court's conclusions are drawn from a markedly different exculpatory provision.  The exculpatory provision in *Feeley* purports to eliminate members' liabilities "unless the act or omission is attributed to gross negligence, willful misconduct or fraud or constitutes a material breach by such Member of any term or provision of this Agreement or any agreement the Company may have with the Member."[228]  In contrast, the only duty appearing in United Tax's exculpation provision is to avoid "willful misconduct."

---

[225] SWZ Ex. C (Debtor Operating Agreement).

[226] *Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012).

[227] *Id.* at 665.

[228] *Id.*  The entire exculpatory provision reads, "*Limited Liability of Members.*  Except as and to the extent required under the Delaware Act or this Agreement, no Member shall be (i) liable for the debt, liabilities, contracts or any other obligations of the Company; or (ii) liable, responsible, accountable in damages or otherwise to the Company or the other Members for any act or failure to act in connection with the Company and its business unless the act or omission is attributed to gross negligence, willful misconduct or fraud or constitutes a material breach by such Member of any term or provision of this Agreement or any agreement the Company may have with the Member." *Id.* at 664.

Trustee cannot succeed on a willful misconduct claim since Trustee did not plead willful misconduct . Trustee argues that Allerand, LLC's willful misconduct was permitting Debtor to entered into a sham Loan and permitting Debtor's equity to be stripped from it.[229] These substantive positions, however, have already been rejected. The only possible exception is that there are disputed issues of material fact surrounding the Settlement Agreement.

But, even if Trustee could maintain a claim for willful misconduct (or any other fiduciary duty), he runs up against the same wall:  Trustee has not shown damages. Allerand, LLC and Sabella both moved for summary judgment on the basis that Debtor was not harmed by any of the conduct Trustee complains of including entry into the Settlement Agreement and transfer of the Foreclosed/Transferred Assets.[230]  They rely on the record evidence that Tax Help only recovered $128,776.60 on the Foreclosed/Transferred Assets, which was less than Debtor owed on the Loan.  Trustee does not directly respond to this argument.  But, presumably, Trustee relies on the Brownstein Report to support damages. As I have already concluded, Brownstein did not opine on the value of the Foreclosed/Transferred Assets as of the date of the foreclosure (or anywhere close); thus, the Brownstein Report does not support Trustee's assertion of damages for breach of fiduciary duty.

Because Allerand, LLC is entitled to summary judgment on Count XI, Sabella is entitled to judgment on Count XII.

---

[229] Answering Brief 52-53.
[230] *See e.g.*, Tax Help Opening Brief 12-18.

**Conclusion**

For the reasons set forth above, I conclude that summary judgment is appropriate on each Count of the Complaint.  Accordingly, I recommend that the District Court enter an order entering summary judgment in favor of all Defendants.

Dated: November 8, 2021

Laurie Selber Silverstein
United States Bankruptcy Judge